**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 3 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

STEVE E. FRAZIER,

  Plaintiff-Appellant and Cross-Appellee,

v.

CHARLES E. SIMMONS, Secretary of the
Department of Corrections,

  Defendant-Appellee and Cross-Appellant.

Nos. 00-3131 & 00-3148

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 96-CV-4020)**

**Submitted on the briefs.**[*]

Kirk W. Lowry, Topeka Independent Living Resource Center, Inc., Topeka,
Kansas, for Plaintiff-Appellant and Cross-Appellee.

Edward F. Britton, Jr., and Lisa A. Mendoza, Special Assistant Attorneys
General, Topeka, Kansas, for Defendant-Appellee and Cross-Appellant.

---

  [*] After examining the briefs and appellate record, this panel has
determined unanimously that oral argument would not materially assist the
determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).
The case is therefore ordered submitted without oral argument.

Before **HOLLOWAY**, **BRORBY**, and **JONES**,[**] Circuit Judges.

_____

**BRORBY**, Circuit Judge.

_____


Mr. Frazier sued Mr. Simmons, his former employer, in his official capacity as Secretary of the Kansas Department of Corrections, for alleged violations of the Americans with Disabilities Act ("Disabilities Act"), 42 U.S.C. §§ 12101 - 12213. The district court granted Mr. Simmons' motion for summary judgment. The district court, however, denied Mr. Simmons' motion for dismissal, holding Mr. Simmons was not immune from suit under the Eleventh Amendment. Mr. Frazier appeals the district court's grant of summary judgment; Mr. Simmons cross-appeals the denial of his motion to dismiss. Both parties have filed supplemental briefs addressing the effect of *Board of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. 356, 121 S. Ct. 955 (2001) on the present suit. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the district court's grant of summary judgment in favor of Mr. Simmons on Mr. Frazier's Title I claims, and remand the case to the district court for initial consideration of Mr. Frazier's Title II claims.

_____

[**] The Honorable Nathaniel R. Jones, Circuit Judge, Sixth Circuit, sitting by designation.

BACKGROUND

Mr. Frazier was diagnosed with multiple sclerosis in 1987. Multiple sclerosis is an incurable chronic nerve disorder. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1174 (10th Cir. 1999). Mr. Frazier's symptoms are relapsing-remitting, and include blurred and partially lost vision, tingling in his hands, a pinched nerve, and pain in his hip resulting in an inability to run, loss of balance, and walking with a limp.

From 1990 until his termination on December 28, 1994, Mr. Frazier worked as an investigator for the Kansas Department of Corrections, Legal Division, in the central office. His position was created specifically to assist Mr. Perrin, who was his supervisor and the only other investigator assigned to the central office investigations division.

In February 1994, Mr. Frazier provided the Department of Corrections, and specifically the "EEO Coordinator," with a letter from his doctor explaining that he was diagnosed with multiple sclerosis. In this letter, his doctor explained that Mr. Frazier's "symptoms have progressed to the point where it jeopardizes his ability to perform his duties at work," and recommended Mr. Frazier be placed indefinitely "on light duty or a disability classification." Mr. Simmons first

learned Mr. Frazier was diagnosed with multiple sclerosis at this time, and Mr. Perrin noticed certain physical symptoms of the disease.

Shortly thereafter, Mr. Perrin told Mr. Frazier he was concerned Mr. Frazier could no longer accurately shoot or safely operate his "heavy," state-issued firearm. Mr. Frazier agreed to relinquish his firearm pending the outcome of his doctors appointments. There is, however, no evidence in the record suggesting Mr. Frazier requested or received his firearm back subsequent to his appointments.

In March 1994, Mr. Frazier briefly returned to work, but then took a second medical leave of absence. After exhausting his personal leave time, Mr. Simmons agreed to allow Mr. Frazier to participate in the shared leave plan, enabling Mr. Frazier to have an extended absence from work. While on his extended leave, Mr. Frazier wrote a letter to Ms. Rickerson, the Human Resource Director, declaring that he does "not believe [he has] or will recover enough mobility or sight in [his] right eye to return to [his] current position [as Investigator for the Department of Corrections]." However, he did request a position as Parole Officer I in Lawrence, Kansas, which was a voluntary demotion from his investigator job. Mr. Frazier applied and interviewed for the Lawrence parole officer position, but

-4-

was denied the job.

In September 1994, Mr. Frazier sent another letter to Ms. Rickerson explaining that his multiple sclerosis had vastly improved, and his doctors provided him written permission to return to work. He indicated his belief he could "perform the major function" of his investigator job, and wished to return to work in early October. He requested two accommodations: stress reduction, and a temperature controlled environment.[1] Furthermore, he asked for a list of the essential functions of his job, and help "in finding a similar position in Topeka with similar wages and accommodations."

At the same time, Dr. Stein mailed a letter to Ms. Rickerson disclosing that Mr. Frazier's neurological condition had "partly improved," and opining:

> [Mr. Frazier] is at risk in his particular work, which could involve physical encounters with potentially violent offenders. From a neurological point of view, it is my recommendation that he be put into a job which would be physically less demanding, would involve less walking and no running or violent activity.

In November 1994, Mr. Frazier was referred by his physician to an independent

---

[1] Mr. Frazier later retracted these two requests for reasonable accommodation, and subsequently sought job restructuring and reassignment to a vacant position.

physical therapist for a functional capacity evaluation. After conducting various strength and balance tests, the physical therapist concluded:

> It is this therapist['s] opinion that some of the requirements would be very difficult and/or unsafe to perform. Those include the following: prolonged standing, prolonged walking, climb, activities that require good balance, physically restrain persons in custody, lifting up to 50# (to shelf height 68" only), carry up to 50#, activities that require kneeling, crouching, restrain violent offender, assist in evacuation of an unconscious or unwilling offender and running.

Prior to his termination, Ms. Rickerson discussed with Mr. Frazier the type of accommodations he sought to enable him to perform his investigator job, as well as his other skills so she could identify available positions for him within the Department of Corrections. Ms. Rickerson then reviewed the vacancies, but did not consider "law enforcement" positions because, according to her, Mr. Frazier had indicated he could not perform that type of work, and she believed his physicians prohibited him from performing the essential functions of those jobs. She also did not consider reassigning him to clerical, management, technical, or professional positions because she did not believe Mr. Frazier had the requisite skills for those positions.

On December 12, 1994, ten days after receiving the results of the physical therapist's evaluation, Mr. Simmons informed Mr. Frazier he was being

terminated, pending a final decision by the state Civil Service Board. Mr.

Simmons proposed the termination because he believed Mr. Frazier was unable to

perform the duties of an investigator and Mr. Frazier's physicians indicated there

was a risk of physical harm or injury if he continued to work as an investigator.

Mr. Frazier again requested the Department of Corrections to restructure his job

or reassign him to a vacant position.

Following his termination, Mr. Frazier sued Mr. Simmons, in his official

capacity, for violation of the Disabilities Act. In his complaint, Mr. Frazier

sought money damages and "such other relief as the Court deems just and

equitable." Mr. Simmons moved the district court for dismissal based on

Eleventh Amendment immunity, and, in the alternative, for summary judgment on

the merits. The district court granted Mr. Simmons' motion for summary

judgment, but denied his motion for dismissal. In granting summary judgment,

the district court summarily concluded Mr. Frazier (1) failed to raise a genuine

issue of material fact he is "disabled" within the meaning of the Disabilities Act,

and (2) even if he could demonstrate his disability, "no rational factfinder could

conclude that [Mr. Simmons] failed to reasonably accommodate [Mr. Frazier's]

impairment." Mr. Frazier appeals the district court's grant of summary judgment

in favor of Mr. Simmons, and Mr. Simmons cross-appeals the court's denial of his

motion to dismiss on Eleventh Amendment immunity grounds.

"We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court." *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir.), *cert. denied*, 528 U.S. 815 (1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms*, 165 F.3d at 1326. "'[W]here the non moving party will bear the burden of proof at trial on a dispositive issue' that party must 'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to that party's case' in order to survive summary judgment." *McKnight v. Kimberly Clark Corp*., 149 F.3d 1125, 1128 (10th Cir. 1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

We also review de novo the district court's denial of Eleventh Amendment

immunity.  *See Sturdevant v. Paulsen*, 218 F.3d 1160, 1164 (10th Cir. 2000).

Because Mr. Simmons' cross-appeal raises Eleventh Amendment immunity, which

is a  challenge to the subject matter jurisdiction of the district court, this "issue

must be resolved before a court may address the merits."  *Fent v. Oklahoma*

*Water Resources Bd.*, 235 F.3d 553, 558 (10th Cir. 2000) (quotation marks and

citation omitted).  As such, we must first determine whether Mr. Simmons, in his

official capacity, is immune from this suit under the Eleventh Amendment.


DISCUSSION

A.  *Eleventh Amendment Immunity from Suit*

> The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to
> extend to any suit in law or equity, commenced or prosecuted against
> one of the United States by Citizens of another State, or by Citizens
> or Subjects of any Foreign State.

U.S. Const., XI amend.  By its plain terms, the Amendment bars suits against a

state by citizens of another state, but the Supreme Court has extended the

Amendment's boundaries to include a bar on suits against a state by that state's

own citizens.  *Garrett*, 531 U.S. at ___, 121 S. Ct. at 961-62.  Thus, "[t]he

ultimate guarantee of the Eleventh Amendment is that nonconsenting States may

not be sued by private individuals in federal court."  *Id.* at 962.

However, there are three primary means to circumvent the Eleventh Amendment. *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1285-86 (10th Cir. 1999). First, a state may waive its immunity by consenting to be sued, "but only in the clearest and most unmistakable terms." *ANR Pipeline Co. v. Lafaver*, 150 F.3d 1178, 1188 (10th Cir. 1998), *cert. denied,* 525 U.S. 1122 (1999). Waiver is not at issue in this case.

Second, Congress may abrogate the states' immunity, but it must unequivocally intend to do so and act pursuant to a valid grant of constitutional authority. *Id.* (recognizing Congress' constitutional authority to abrogate a state's immunity derives principally from its Fourteenth Amendment Section Five power). The Supreme Court resolved the issue of whether Congress acted pursuant to a valid grant of constitutional authority when professing to abrogate states' Eleventh Amendment immunity in Title I of the Disabilities Act. *See Garrett*, 531 U.S. at ___, ___, 121 S. Ct. at 961, 967-68. The Court held:

> [I]n order to authorize private individuals to recover money damages against the States, there must be a pattern of discrimination by the States which violates the Fourteenth Amendment, and the remedy imposed by Congress must be congruent and proportional to the targeted violation. Those requirements are not met here, and to uphold the [Disabilities] Act's application to the States would allow Congress to rewrite the Fourteenth Amendment .... Section 5 does not so broadly enlarge congressional authority.

*Id.* at 967-68. Accordingly, after the Court's decision in *Garrett*, a private

-10-

individual cannot sue a state or state official in federal court for money damages under Title I of the Disabilities Act. *Id.* at 968 n.9; *see also ANR Pipeline*, 150 F.3d at 1187 (recognizing a suit is barred by the Eleventh Amendment when plaintiff seeks money damages against an official of a state agency). In Mr. Frazier's supplemental brief to this court addressing the effects of the *Garrett* decision, he abandons his pursuit of money damages, and seeks only equitable relief. *See Garrett*, 531 U.S. at ___, 121 S. Ct. at 968 n.9 (acknowledging its holding does not foreclose a disabled person from all federal recourse because, among other options, a private individual may seek injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908)).

Finally, and most relevant to this appeal, the *Ex parte Young* doctrine enables a plaintiff to circumvent the Eleventh Amendment. *See J.B.*, 186 F.3d at 1286. Under this doctrine, a suit against a state official in his official capacity seeking prospective equitable relief is permitted, while a suit requesting retroactive relief is considered to be a suit against the state. *ANR Pipeline*, 150 F.3d at 1188. Applying this principle, an action is barred by the Eleventh Amendment, even though a state official is named as the defendant, "if the state is the real, substantial party in interest. Whether the state is the real party in interest

turns on the relief sought by the plaintiffs."[2]  *Id.* (quotation marks and citation

omitted).  We therefore turn our attention to the relief Mr. Frazier seeks.


After conceding he is barred from seeking money damages, Mr. Frazier

proffers two alternative arguments to support his contention he requested

prospective injunctive relief from Mr. Simmons in his official capacity, and, as a

result, the *Ex parte Young* doctrine should apply.  First, he claims the pretrial

order "memorialized" his request for prospective injunctive relief in the clause

seeking "such other relief as the Court deems just and equitable."  Second, if this

court determines his prayer for "just and equitable" relief is insufficient as a

matter of law, he suggests this court nevertheless can fashion an equitable remedy

---

[2] The scope of the *Ex parte Young* doctrine is further limited.  *See ANR Pipeline*, 150 F.3d at 1188-90.  Federal courts lack jurisdiction over suits that seek:  (1) to require the state official to comply with state law; (2) to redress past wrongs, rather than ongoing violations; (3) a declaratory judgment from the federal court when the only purpose for such a judgment is its "res judicata effect in a subsequent state-court proceeding;" (4) "an award for monetary relief that is the practical equivalent of money damages, even if this relief is characterized as equitable."  *Id.* at 1188-89.  In addition, *Ex parte Young* "should not be invoked when Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right," or the requested relief "implicates special sovereignty interests."  *Id.* at 1189-90 (quotation marks and citations omitted).  In this instance, Mr. Simmons fails to argue, and our independent review of the record does not show, that these limitations to the *Ex parte Young* doctrine are implicated.

based on its "inherent power" to enforce violations of federal law.[3]  Mr. Simmons, however, argues that Mr. Frazier seeks only monetary damages because Mr. Frazier raised his claim for "unspecified equitable relief" for the first time on appeal.  In this instance, we conclude Mr. Frazier sufficiently indicated in his complaint, and the district court repeated in its pretrial order, that he sought prospective equitable relief against Mr. Simmons in his official capacity.[4]

We caution practitioners that a boilerplate recitation of "just and equitable" relief included in one's prayer for relief is far from an exemplary request for prospective equitable relief under the *Ex parte Young* doctrine.  *Cf. Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 910 (2d Cir. 1997) (holding, in an Age Discrimination in Employment Act lawsuit, plaintiff's "general, ritualistic prayer for additional ['just and proper'] relief" was insufficient to defeat summary

---

[3]  We note Mr. Frazier alleges violations of Title II in his complaint, and asserts he is entitled to injunctive relief on these claims.  It is unclear from the pretrial order whether his Title II claims are preserved, but it is evident the district court did not address them in its order granting summary judgment for Mr. Simmons.  We will not consider the issue on appeal when it was not passed on below, and we remand the case to the district court to address the Title II issue first.  *See North Texas Produc. Credit Ass'n v. McCurtain County Nat'l Bank*, 222 F.3d 800, 812 (10th Cir. 2000).  For this reason, our holding in this case is limited to Title I of the Disabilities Act.

[4]  We need not discuss Mr. Frazier's alternative contention because we hold he sufficiently indicated he sought prospective injunctive relief.

judgment because plaintiff rejected defendant's offer of reinstatement and failed to specify what activity ought to be enjoined); *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1526 n.12 (11th Cir. 1994) (rejecting, in the context of a securities fraud action, "appellees' suggestion that they successfully invoked the district court's equitable jurisdiction through their requests for any additional relief as may appear 'just and proper' at the conclusion of each complaint. The mere incantation of such boilerplate language does not convert a legal cause of action into a legitimate request for equitable relief.").

Nevertheless, two cases guide us in our determination that Mr. Frazier's request for equitable relief is sufficient to trigger application of *Ex parte Young*. In the first case, *Calderon v. Kansas Dep't of Soc. and Rehab. Servs.*, 181 F.3d 1180 (10th Cir. 1999), the plaintiff sued the state, a state official in her official capacity, and a state court judge, alleging violations of her constitutional rights. Although plaintiff conceded her complaint failed to expressly request prospective injunctive relief, she argued that omissions in her prayer for relief do not foreclose the availability of such relief. *Id.* at 1183. This court recognized, "[t]he threshold question is ... whether [plaintiff]'s complaint gave *any indication* that she might be entitled to injunctive relief for ongoing federal ... violations by state officials." *Id.* (emphasis added). After articulating the appropriate inquiry,

-14-

this court examined both her complaint and her Memorandum in Opposition to Defendant's Motion to Dismiss. *Id.* at 1183-84. Applying a liberal construction to the complaint, we held she failed to allege an ongoing violation that would entitle her to prospective injunctive relief against the state official. *Id.* at 1184. Therefore, application of the *Ex parte Young* doctrine was inappropriate. *Id.* at 1185.

The second case, *Andrus v. Arkansas,* 197 F.3d 953 (8th Cir. 1999), employs persuasive reasoning and is factually similar to the case at bar. In *Andrus*, plaintiffs sued the state of Arkansas, the state police department, and the state police colonel in his official capacity. *Id.* at 954-55. The police colonel moved for dismissal based on Eleventh Amendment immunity. The trial court denied his motion. *Id.* On appeal, the police colonel argued plaintiffs' complaint alleged only monetary damages against him. The police colonel claimed the plaintiffs should be "required to request injunctive relief against [the police colonel] as specifically as if they were pleading individual capacity." *Id.* at 955. The Eighth Circuit disagreed and reasoned (1) "Fed. R. Civ. P. 9 does not create any special pleading requirements relating to requests for relief, ... and, as a general rule, requesting incorrect relief is not grounds for dismissal," and (2) the complaint requested injunctive relief "with sufficient clarity." *Id.* The plaintiffs'

complaint specifically requested injunctive relief, although it never explicitly requested injunctive relief against the police colonel by name. *Id.* Furthermore, the plaintiffs requested "such other equitable relief as is just and proper." *Id*. at 956. The Eighth Circuit concluded the request for "just and proper" relief "is easily understood to include injunctive relief against [the police colonel], or his successor, if relief needs to be in that form to be effective." *Id.* (recognizing the complaint could have been clearer, but holding it was not inadequate). For these reasons, the court refused to dismiss the police colonel as a defendant in his official capacity. *Id.*

With these cases in mind, we examine Mr. Frazier's complaint and the pretrial order to determine whether he gave "any indication" he is entitled to prospective injunctive relief for alleged violations of Title I of the Disabilities Act. *Calderon*, 181 F.3d at 1183. We conclude he has provided sufficient indication that he seeks equitable relief. First, in his complaint, he alleged he was harmed by Mr. Simmons' denial of a reasonable accommodation and, ultimately, his wrongful termination. *See Buchwald v. University of New Mexico Sch. of Med.*, 159 F.3d 487, 495 n.5 (10th Cir. 1998) (noting plaintiff sought prospective injunctive relief despite the fact that the harm she suffered by being excluded from the school occurred in the past). In the pretrial order, the district court lists,

as an issue of law, "[t]he nature and extent of any equitable relief" to which Mr. Frazier may be entitled. Finally, in both his complaint and the pretrial order, Mr. Frazier prays for "just and equitable relief." *See Andrus*, 197 F.3d at 955-56. The nature of the harms Mr. Frazier alleged he suffered makes his claims amenable to injunctive relief; that, combined with his general prayer for equitable relief, indicates he sought prospective equitable relief against Mr. Simmons. Accordingly, Mr. Frazier's claim for prospective equitable relief from Mr. Simmons in his official capacity fits within the *Ex parte Young* doctrine. We therefore affirm, for different reasons, the district court's denial of Eleventh Amendment immunity. *See United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994).

B. *Disabilities Act*

Having determined Mr. Simmons, in his official capacity, is not immune from suit, we proceed to the merits of Mr. Frazier's claims. Mr. Frazier argues the district court erroneously held he failed to satisfy his *prima facie* case under the Disabilities Act and neglected to view the evidence in the light most favorable to him. Specifically, Mr. Frazier claims the district court erred by failing to: (1) analyze his multiple sclerosis under all three definitions of disability analysis provided in 42 U.S.C. § 12102(2); (2) leave for the jury the factual inquiry into

-17-

whether job functions are essential or marginal; and (3) recognize Mr. Simmons could reasonably accommodate Mr. Frazier's disability by "restructuring a marginal job duty," identifying vacant positions through the interactive process, and reassigning him to a vacancy.[5]

To sustain a claim under the Disabilities Act, Mr. Frazier must show he: (1) is "disabled" within the meaning of the Disabilities Act; (2) is a "qualified individual," *i.e.*, he "with or without reasonable accommodation can perform the essential functions of" the job he held or desires, 42 U.S.C. § 12111(8); and (3) was terminated because of his disability. *Anderson*, 181 F.3d at 1175.

1. *"Disabled" as Defined in the Disabilities Act*

Mr. Frazier argues the district court failed to analyze whether his multiple sclerosis constitutes a "disability" under each of the three definitions provided in

---

[5] To the extent Mr. Frazier raises an additional "issue" in his appellate brief advocating that courts construe the Disabilities Act "to make its terms effective," and not place disabled plaintiffs in a "Catch-22," we note he failed to raise this issue in either his complaint or his response to Mr. Simmons' motion for summary judgment. It is a general rule that this court will not consider a new issue for the first time on appeal. *See Walker v. Mather (In re Walker)*, 959 F.2d 894, 896 (10th Cir. 1992).

the Disabilities Act, and erroneously concluded he was not disabled.[6] In this instance, we will assume without deciding Mr. Frazier's multiple sclerosis is a disability, and instead focus on the question of whether he is "qualified" such that he can perform the "essential functions" of his job or a job he desires, with or without reasonable accommodations.[7] 42 U.S.C. § 12111(8).

2. *"Qualified" Individual*

Before we examine whether certain functions are "essential" to the job of an investigator for the Department of Corrections, we must determine what activities Mr. Frazier was unable to perform at the time of the employment decision. *See Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1003 (7th Cir. 1998) ("The determination as to whether an individual is a 'qualified individual with a disability' must be made as of the time of the employment decision." (Citation

---

[6] The Disabilities Act defines "disability" as: (1) "a physical or mental impairment that substantially limits one or more of the major life activities of such individual;" (2) "a record of such an impairment; or" (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(2). The district court concluded Mr. Frazier was not disabled because he was precluded from working only a narrow range of jobs, and Mr. Simmons did not regard him as disabled.

[7] We examine whether Mr. Frazier could perform the essential functions of the "job he desires," *i.e.*, Parole Officer I, Corrections Counselor I, and Corrections Manager II, below in the context of our reasonable accommodation inquiry.

omitted.)).


a.  *Activities Mr. Frazier Cannot Perform*

Two of the physical activities Mr. Frazier was unable to perform at the time of the employment decision are documented in his doctor's letter and a physical therapist's evaluation.  In a letter dated September 28, 1994, Dr. Stein, a neurologist, opined that Mr. Frazier "is at risk in his particular work, which could involve physical encounters with potentially violent offenders....  [I]t is my recommendation that he be put into a job which would be physically less demanding, would involve less walking and no running or violent activity."  In November 1994, an independent physical therapist conducted a functional capacity evaluation of Mr. Frazier, and came to a similar conclusion as Dr. Stein.  The evaluation, in relevant part, provides, "It is this therapist['s] opinion that some of the requirements would be very difficult and/or unsafe to perform.  Those include the following:  ... physically restrain persons in custody, ... restrain violent offender, assist in evacuation of an unconscious or unwilling offender and running."  While the therapist fails to clearly distinguish between the activities Mr. Frazier has difficulty with and those he is unable to perform, we read the evaluation and Dr. Stein's letter together to mean Mr. Frazier was incapable of performing certain physical activities, *i.e.*, running and engaging in violent

activity.

Despite the clear language in Dr. Stein's letter, Mr. Frazier attempts to narrow the scope of the medical opinions. Mr. Frazier claims, "[the doctor] only meant no arrests without assistance. It is a reasonable inference from Dr. Stein's restriction that Mr. Frazier was still medically permitted to perform arrests with assistance." We reject Mr. Frazier's assertion that the doctor "only meant" no unassisted arrests as conclusory and unsupported by the record. *See L & M Enters., Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000) ("Unsupported conclusory allegations ... do not create a genuine issue of fact."); *see also Laurin v. Providence Hosp.*, 150 F.3d 52, 59 (1st Cir. 1998) (recognizing plaintiff could not "satisfy her rebuttal burden under Rule 56 by relying upon conclusory allegations, improbable inferences, and unsupported speculation") (quotation marks and citation omitted)). In fact, such an assertion appears to contradict Dr. Stein's determination, in the same letter, that Mr. Frazier's job puts him at risk precisely because it could involve "physical encounters with potentially violent offenders." We accept Dr. Stein's medical opinion at face value – no violent activity, including physical encounters with potentially violent offenders.

Our conclusion Mr. Frazier was medically unable to engage in any violent activity, including performing unassisted arrests, does not resolve whether Mr. Frazier was also unable to carry a firearm. Mr. Simmons presented substantial evidence showing Mr. Frazier agreed to relinquish his firearm in April 1994, after Mr. Perrin expressed his concern that Mr. Frazier could not safely carry or accurately shoot his state-issued gun. In response to Mr. Simmons' showing, Mr. Frazier merely points to the absence of a medical restriction in Dr. Stein's letter as evidence he could carry a firearm. We conclude the doctor's silence fails to create a genuine issue that Mr. Frazier is able to carry a firearm, particularly in light of the facts (1) nothing in the record suggests Mr. Frazier requested or received his firearm back after his doctor's appointments, (2) Mr. Frazier admitted in his reply to Mr. Simmons' motion for summary judgment that he cannot carry a firearm, and (3) Mr. Frazier stated in his affidavit that the vacant jobs he was interested in did not require him "to make arrests nor do they require [him] to carry a firearm."

In sum, viewing the evidence and reasonable inferences in the light most favorable to Mr. Frazier, we conclude the record before us establishes that at the time of the employment decision Mr. Frazier was physically unable to run, engage in violent activity, and carry a firearm.

b. *Essential Functions*

Mr. Frazier argues the district court erroneously concluded he was not able to perform the essential functions of his job. An "essential function" is defined as "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). Although not an exhaustive list, a job function may be viewed as essential if: (1) "the reason the position exists is to perform that function;" (2) there are a "limited number of employees available among whom the performance of that job function can be distributed;" and/or (3) "the incumbent in the position is hired for his or her expertise or ability to perform the particular [highly specialized] function." 29 C.F.R. § 1630.2(n)(2)(i-iii). According to these regulations implementing the Disabilities Act, certain evidence may be considered in determining whether a particular function is essential:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;
>
> (v) The terms of a collective bargaining agreement;

-23-

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3) (recognizing the list of potential evidence is illustrative rather than comprehensive). Mr. Frazier bears the burden of showing he is able to perform the essential functions of his investigator job, and that he is therefore "qualified." *Borgialli v. Thunder Basin Coal Co.*, 235 F.3d 1284, 1292 (10th Cir. 2000).[8]

Our case law recognizes an employer may require "an employee to perform a multitude of tasks in a wide range of environments." *Anderson*, 181 F.3d at 1176; *see also Martin v. Kansas*, 190 F.3d 1120, 1130 (10th Cir. 1999), *overruled on other grounds, Garrett*, 531 U.S. at ___, 121 S. Ct. at 967-68. In *Martin*, the plaintiff worked as a corrections officer in a prison.[9] 190 F.3d at 1123, 1124 n.1.

---

[8] Mr. Frazier's appellate and reply briefs focus narrowly on whether "arrests," and in particular "unassisted arrests," are essential to his investigator job. Nevertheless, our inquiry is whether the ability to engage in violent activity, to run, and to carry firearms are essential functions of an investigator position.

[9] Mr. Frazier asserts, in a conclusory fashion, *Martin* is an inapposite factual and legal comparison because Mr. Frazier's "investigator" job "is fundamentally different from prison correctional officers, where broad duties have been justified by the need for public safety and the nature of the prison environment." We disagree. Both Mr. Frazier and Mr. Martin were "law enforcement officers" vested with the statutory duty "to maintain public order or to make arrests for violation of the laws of the state of Kansas ... or with a duty to

Plaintiff suffered from chronic, degenerative joint arthritis, which prohibited him from running to alarms or up and down stairs frequently, and restraining violent offenders without assistance. *Id.* at 1124, 1132. This court observed:

> [T]he very reason a corrections officer position exists is to provide safety and security to the public, as well as to [prison] employees and inmates; as such, the ability to provide safety and security, including the ability to respond without hesitation or limitation in an emergency is absolutely inherent to that position.... Likewise, [plaintiff] would submit that continuous running and the physical restraint of violent inmates without assistance is not an everyday occurrence.... However, we believe that the potentially dire consequences of not requiring a corrections officer to have those capabilities (even if exercised only occasionally) underscores their importance.

*Id.* at 1132; *see also Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1527 (11th Cir. 1997) (holding infrequently performed field work to be essential function of detective job; thus, the percentage of time spent on task is not dispositive of whether the task is an essential function.) Accordingly, we held that plaintiff failed to create a genuine issue of material fact "rebutting the State's position that the essential functions of [plaintiff's] job were those broader functions of a

---

maintain or assert custody or supervision over persons accused or convicted of crime." Kan. Stat. Ann. § 22-2202(13); *see also* Kan. Stat. Ann. § 75-5247a ("all persons on the staff of the department of corrections ..., regardless of rank, while acting within the scope of their duties as employees of the department of corrections, shall possess such powers and duties of a law enforcement officer "); *Martin*, 190 F.3d at 1124 n.1. Mr. Frazier had this duty regardless of whether he worked in a prison setting or on a crime scene investigation.

corrections officer position, as opposed to the limited duties of a particular post."
*Martin,* 190 F.3d at 1132.

The crux of Mr. Frazier's argument on appeal is that, based on his experience, the essential functions of his job are those duties he spends the most time performing, including doing paperwork in his office, conducting criminal and civil investigations, interviewing witnesses, surveilling, working on the phone and computer, traveling, and transporting suspects to jail. According to Mr. Frazier, the functions he cannot perform are marginal to his job because they are rarely required. Conversely, Mr. Simmons claims Mr. Frazier cannot perform the essential functions of his former investigator position. He asserts Mr. Frazier's job requires an ability "to perform a wide variety of functions in a wide variety of conditions without assistance." In support of his position that engaging in violent activity and physically restraining violent offenders, running and carrying a firearm are fundamental duties of an investigator, Mr. Simmons submitted job descriptions and deposition testimony.

The written job descriptions outline the specific functions of an investigator. The first job description, signed by Mr. Frazier in 1992, lists an investigator's tasks and percentage of time spent at each task. Sixty-five percent

of an investigator's time is spent conducting "criminal investigations," while thirty percent is spent performing "civil investigations." According to the position description, "[i]n conducting various types of investigations, arrests are made which could result in physical harm and possibly death to not only the Investigator, but to other persons if not handled properly." As such, the position requires "[d]aily use of motor vehicle; photographic equipment; narcotic testing equipment; and firearms."

The second job description lists "[t]he physical requirements ... representative of those that must be met by an employee to successfully perform the essential functions of Investigator positions." *See Basith v. Cook County*, 241 F.3d 919, 928 (7th Cir. 2001) (recognizing an employer's "Essential Job Function" form, although not prepared before advertising or interviewing applicants for the job, may be considered by the court because, among other reasons, the evidence "is not limited to" the listed examples in 29 C.F.R. § 1630.2(n)(3) and the form reflects the employer's judgment on which functions are essential). According to this description, an investigator is "frequently" required, among other things, to "restrain a violence [sic] offender," "assist in

evacuation of an unconscious or unwilling offender," and run.[10]  Similarly, he is

"occasionally" required to "use a firearm."[11]  Therefore, based on both job

descriptions, it is evident an investigator is at risk of physical harm during an

investigation, and must be able to run, carry a firearm, and physically restrain

offenders in order to protect himself and others, and conduct the investigation.

Mr. Frazier even testified in deposition there is the possibility that during a

crime scene investigation he may have to "restrain people who are trying to get

away," or "[t]ake the person to the ground" if the person was unwilling to go with

him.[12]  In such a situation, Mr. Frazier's multiple sclerosis would preclude him

from being able to use physical force or run from the confrontational offender.

*See* 29 C.F.R. § 1630.2(n)(3)(iv) (evidence of the "consequences of not requiring

the incumbent to perform the function" may be considered); *Martin*, 190 F.3d at

---

[10] "Frequently" is defined in the position description as "at frequent or brief intervals; often; occurring often.  A function should be considered frequently done if done on a routine (weekly; bi-monthly) basis."

[11] "Occasionally" is defined in the position description as "occurring on a particular occasion; of irregular occurrence; happening now and then; infrequent. A function should be considered done occasionally if only done in the event of a unique or special event (*e.g.*, escape, offender-on-staff attack, emergency).

[12] Mr. Frazier admits conducting criminal and civil investigations is an essential function of his job.

1132 (recognizing the "the potentially dire consequences" of not requiring a corrections officer to have the ability to run, restrain violent offenders, or respond to emergency situations). Even viewing the evidence in the light most favorable to Mr. Frazier and assuming that an investigator may be required to perform these physical activities infrequently, the potential for physical confrontation with a suspect exists any time Mr. Frazier conducts a crime scene investigation. *See Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 727, 731 (6th Cir. 2000) (recognizing that although a sheriff's deputy may be required to physically restrain a prisoner only infrequently, the potential for physical confrontation exists on a daily basis, and the failure to require a deputy to perform such activity would be a threat to security).

Mr. Simmons testified, in deposition, that Mr. Frazier's job was created specifically to assist Mr. Perrin in the field, and Mr. Frazier was expected to carry a gun and apprehend offenders. *See* 42 U.S.C. § 12111(8) ("consideration shall be given to the employer's judgment"). Mr. Frazier suggests he can assist Mr. Perrin in other ways, such as "doing his unwanted paperwork." While paperwork, or even office work in general, comprises part of Mr. Frazier's duties, the record unequivocally demonstrates Mr. Frazier's job was not created for the limited purpose of providing administrative assistance. *See Anderson*, 181 F.3d at 1174,

1176-77 (recognizing that plaintiff was hired as a temporary production operator, which required her to perform multiple tasks, rather than a can sorter, which performs only one limited, sedentary task).

It is also evident from the record that Mr. Frazier was one of only two investigators in the Department of Corrections. While Mr. Frazier acknowledges the limited number of employees, he suggests certain activities he is unable to perform could be assigned to Mr. Perrin, other investigators who work for the state, or the many other "law enforcement officers who could be called to make arrests or act as backup." Even if we assume certain duties could be assigned to Mr. Perrin or state law enforcement officers, "[t]he mere fact that others could do [Mr. Frazier's] work does not show that the work is nonessential." *See Basith*, 241 F.3d at 929 (noting that any function, whether essential or nonessential, could be assigned to other employees).

Based on the evidence as a whole, we hold Mr. Frazier failed to put forth sufficient evidence to create a genuine issue of material fact rebutting Mr. Simmons' position that his job required him to perform multiple essential functions in different environments, including carrying a firearm, running, and engaging in violent activity. *See Martin,* 190 F.3d at 1132.

c. *Reasonable Accommodations*

Having concluded Mr. Frazier is unable to perform the essential functions of his job as an investigator, we next must determine whether Mr. Simmons could reasonably accommodate Mr. Frazier. According to Mr. Frazier, he specifically asked Mr. Simmons to restructure his investigator job, or to identify and reassign him to a vacant position within the Department of Corrections.

(1) *Job Restructuring*

Mr. Frazier asserts a reasonable accommodation is to restructure the duties of his investigator job. Again, he suggests "making unassisted arrests" is a marginal duty, which could be assigned to Mr. Perrin, or to other state investigators and law enforcement officers. Given our conclusion that the ability to engage in violent activity, to run, and to carry a firearm are essential functions of his job, we hold that reassigning these functions to another investigator in the office or other state employees is not a reasonable accommodation.[13] Although job restructuring is a possible accommodation under the Disabilities Act, "[a]n accommodation that eliminates the essential function of the job is not

---

[13] As we have held the reassignment of essential functions is not a reasonable accommodation, we need not address whether the restructuring would cause an undue burden on Mr. Simmons.

reasonable." *Smith v. Blue Cross Blue Shield of Kansas, Inc.*, 102 F.3d 1075, 1076 (10th Cir. 1996), *cert. denied*, 522 U.S. 811 (1997); *see also Basith*, 241 F.3d at 930 (rejecting plaintiff's suggestion to assign essential functions to other employees because it would require the employer to restructure plaintiff's job as well as the jobs of other employees). Because restructuring his job was not reasonable as a matter of law, summary judgment in favor of Mr. Simmons on this issue was proper.

(2) *Identification of, and Reassignment to, a Vacant Position*

Mr. Frazier also requested the reasonable accommodation of identifying available positions through the interactive process and reassigning him to a vacant position within the Department of Corrections. We recognize once the employee has provided the employer with appropriate notice, "both parties have an obligation to proceed in a reasonably interactive manner to determine whether the employee would be qualified, with or without reasonable accommodations, for another job within the company and, if so, to identify an appropriate reassignment opportunity if any is reasonably available." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999) (en banc). However, even if the employer failed to sufficiently engage in the interactive process, the employer can still prevail on summary judgment if the employee failed to "show that a reasonable accommodation was possible and would have led to a reassignment position."

*Midland Brake*, 180 F.3d at 1174; *see also Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 234 (3d Cir. 2000) (holding "in a failure-to-transfer case, if, after a full opportunity for discovery, the summary judgment record is insufficient to establish the existence of an appropriate position into which the plaintiff could have been transferred, summary judgment must be granted in favor of the defendant – even if it also appears that the defendant failed to engage in good faith in the interactive process"); *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997) (holding the employer's failure to interact with the employee does not preclude the employee from losing on summary judgment because the employee must still prove a reasonable accommodation could have been made).

Mr. Frazier argues summary judgment for Mr. Simmons was inappropriate because "[t]he State failed to engage in any meaningful interactive process" after Mr. Frazier gave notice of his disability and expressed his desire for reassignment to a vacant position. Mr. Frazier claims to have identified, through the discovery process, eight vacant positions he is qualified to perform.[14]  Of the eight

_____

[14]  There is a discrepancy in the actual number of vacancies available.  In Mr. Frazier's statement of issues on appeal he asserts six vacancies existed, but in his analysis of the issue he identifies eight.  In contrast, Mr. Simmons claims only two vacancies existed during the "relevant period, both of which were law enforcement positions in parole or corrections."  The district court did not identify the number of vacant jobs or the job titles, but summarily concluded, "Frazier was not qualified for those open positions.  Moreover, those positions

vacancies, six were demotions to Parole Officer I, one was a demotion to Corrections Counselor I, and the last was a Corrections Manager II position. To survive summary judgment, Mr. Frazier must show "that a reasonable accommodation was possible and would have led to a reassignment position." *Midland Brake*, 180 F.3d at 1174. We examine the record to determine whether Mr. Frazier has made such a showing.

Of the vacancies Mr. Frazier identified during discovery, he relies most heavily on his contention he is qualified to work in the vacant Parole Officer I positions. He cites his own affidavit, a description of the essential functions required of a parole officer, and an incumbent parole officer's position description, as evidence that "[p]arole officers are not required to make arrests or carry a gun." However, Mr. Frazier does not dispute any of the other physical duties Mr. Simmons testified are essential to the parole officer function. In fact, the very evidence Mr. Frazier cites clearly establishes parole officers must occasionally restrain individuals and run. Similarly, the position description states that a parole officer has "[d]aily contact with individuals with felony convictions and making home and community contacts. These types of contacts

---

were tantamount to promotions from Frazier's investigator job." On our de novo review we assume eight vacancies existed, and we examine each in turn.

have a degree of risk as well as conducting investigations which require entering unfamiliar residences." Hence, it remains uncontroverted that Parole Officer I positions present a daily risk of confrontation and require, albeit occasionally, physical duties that Mr. Frazier is unable to perform. Summary judgment in favor of Mr. Simmons on this issue therefore is appropriate. Because Mr. Frazier is not qualified to work as a Parole Officer I, reassignment to these vacant positions is not a reasonable accommodation.[15] *See Midland Brake*, 180 F.3d at 1170 (acknowledging employers need not modify an essential function of a vacant job).

To the extent Mr. Frazier argues there is a genuine issue of material fact concerning his qualifications to work as a Corrections Counselor I, we disagree. The only evidence in the record suggesting Mr. Frazier is qualified to work as a Corrections Counselor I is his own affidavit, in which he states, in relevant part:

> The positions which I identify in this Affidavit are positions which I am qualified to do ....
>
> ... I have reviewed the requirements of the jobs; I have the requisite training/education with 17 years experience in the corrections field and an associate of arts degree. They do not require me to make arrests nor do they require me to carry a firearm.

---

[15] Because we hold Mr. Frazier has not shown he was qualified for the vacant parole officer positions, we need not address Mr. Frazier's contention he was entitled to be reassigned to this vacancy rather than merely considered for the position.

Mr. Frazier's affidavit fails, however, to rebut Mr. Simmons' evidence that Corrections Counselors work within the state prison facilities, have daily contact with adult felons, and are required to physically restrain offenders. Again, the essential function description mandates a Corrections Counselor to occasionally restrain offenders and run. More significantly, the position description establishes that a Corrections Counselor I must "assist[] uniformed security staff in times of emergency to include ... staffing security posts and/or performing other security functions to include assisting the Correctional Security force in maintaining order and control of the institution." Although Mr. Frazier may possess the requisite education to perform the job, he has not shown the activities he is unable to perform are nonessential functions of the Corrections Counselor I position, and that he is therefore qualified for the job. We hold reassignment to this vacant Counselor I position is not a reasonable accommodation as a matter of law.

Mr. Frazier admits the vacant Corrections Manager II job is a "Range 29 position," while his former investigator position was "Range 24." Without citing any legal or factual authority, Mr. Frazier contends reassignment to this vacancy does not constitute a "promotion" because the salary he earned as an investigator is at the lower end of the salary range for the Corrections Manager II position.

An employer does not have to consider reassignment positions that constitute a promotion, but we need not determine in this instance whether the vacant Corrections Manager II position, which encompasses to some degree Mr. Frazier's former salary, is a "promotion." *See Midland Brake*, 180 F.3d at 1176; *see also Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 699 (7th Cir. 1998) (recognizing a promotion to a higher level position is not a reasonable accommodation). Rather, we hold Mr. Frazier failed to show he is qualified to perform the essential functions of this management position, which undisputedly include, among other duties, physically restraining individuals and running.

In sum, even if we assume a breakdown in the interactive process occurred, we hold Mr. Frazier did not "show that a reasonable accommodation was possible and would have led to a reassignment position." *Midland Brake*, 180 F.3d at 1174. As such, summary judgment in favor of Mr. Simmons was proper.[16]

---

[16] Mr. Simmons argues, in the alternative, that Mr. Frazier is a "direct threat," and no reasonable accommodation could eliminate or reduce the safety risk he poses to others. We need not address this alternative argument because we affirm summary judgment in favor of Mr. Simmons on other grounds. *See Griffin v. Davies*, 929 F.2d 550, 554 (10th Cir.) ("We will not undertake to decide issues that do not affect the outcome of a dispute."), *cert. denied,* 502 U.S. 878 (1991).

For the reasons stated above, we **AFFIRM** the grant of summary judgment in favor of Mr. Simmons on Mr. Frazier's Title I claims. This court expresses no opinion on the survival or merits of Mr. Frazier's Title II claims, and we **REMAND** the case to the district court for initial consideration of those claims.