**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 24 2001**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

_____

JOHN MATHEWS,

        Plaintiff - Appellant,

   v.

THE DENVER POST, a Colorado
Corporation,

        Defendant - Appellee.

No. 99-1329

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 98-M-865)**
_____

Barry K. Arrington, Arrington & Rouse, P.C., Denver, Colorado, for the
appellant.

Mary H. Stuart (Roxane J. Perruso with her on the brief), Holme, Roberts &
Owen, LLP, Denver, Colorado, for the appellee.
_____

Before **SEYMOUR, JOHN R. GIBSON**,[*] and **BRISCOE**, Circuit Judges.
_____

**JOHN R. GIBSON**, Circuit Judge.
_____

---

   [*] The Honorable John R. Gibson, Circuit Judge, United States Court of Appeals for
the Eighth Circuit, sitting by designation.

John Mathews brought this suit against his employer, the Denver Post, contending that the Post laid him off in violation of the Americans with Disabilities Act, 42 U.S.C. § 12112 (1994), from November 1994 to May 1996. The district court granted summary judgment to the Post, holding that Mathews had not shown he was a disabled person within the meaning of the Act, nor had he shown he was qualified to do his job on the dates in question. We affirm.

Mathews began work at the Post in 1983, was promoted to journey-level mailer in 1988, and is currently employed there. Mathews suffers from epilepsy, including grand mal seizures. He suffered a grand mal seizure on September 6, 1994 that required two days' hospitalization. His doctor told him not to return to work for one month. The Post received the following letter from Mathews's doctor, Jack Sylman, M.D., dated October 8, 1994:

> In response to your letter dated October 3, 1994, Mr. John Mathews did have an epileptic seizure and I would not be comfortable with him either driving, or being near or operating heavy equipment for at least three months. This is a fairly standard guideline generally accepted within the community.

As time passed, Dr. Sylman continued to reiterate the same advice. In his letter of November 14, 1994, he stated:

> Mr. John Mathews has epilepsy and has had isolated grand mal seizures, some of which have occurred at work. Unfortunately, there is no cure for this condition though reasonable control has been achieved with Dilantin. However, I cannot assure him that he might not have isolated sporadic seizures without warning. Ideally, it

would be best if he were not to drive or work around heavy machinery.

Mathews sought to return to work, but proposed that the Post accommodate him by letting him do the part of the journey-level mailer job that did not involve working with machines.

The job description for journey-level mailer listed five essential functions of the job, three of which were: "Stand at insert machines, lifting inserts from pallets and feeding insert machines at the appropriate stations"; "Lift bundles, stack on pallets and push/pull cart or operate power dolly to insert machine or storage areas"; and "Operate power dolly to move dated materials for proper insert run."

The Post terminated Mathews because his medical restrictions prevented him from performing the essential functions of his job. At the same time, the Post continued to assist Mathews in looking for a position at the Post that he could perform with his medical restrictions.

Mathews continued to inquire about coming back to work. He met with the Post's Employee Relations Manager in April 1995, and she promptly wrote his doctor asking whether Mathews could perform the journey-level mailer job safely. She enclosed a copy of the job description. On April 12, 1995, Dr. Sylman replied to the Post:

John could return to work in a job in which he would not be at risk of injuring himself.

Restrictions would include frequent driving or working around heavy, dangerous machinery, or in elevated positions where he might sustain a fall.

If possible, he should not work with heavy machinery. Specifically working with a power dolly and an insert machine may pose problems.

On May 9, 1996, Mathews's doctor lifted his medical restrictions, stating that he "should be able to drive or work with machinery." The Post then hired Mathews back at his old job.

Mathews sued the Post, claiming that the Post discharged him in violation of the ADA, failed to provide a reasonable accommodation for his disability, and fired him in retaliation for filing a complaint with the EEOC.[1]

The Post moved for summary judgment, which the district court granted. First, the court held that Mathews had not shown that he was disabled. Mathews argued that his epilepsy substantially limited him in the major life activity of working. Mathews was only able to show that his epilepsy interfered with his ability to do particular jobs, whereas he was required to show a limitation on his ability to do a class of jobs or a broad range of jobs in order to establish substantial limitation on his ability to work. Second, the court held that Mathews

---

[1]At oral argument in this appeal Mathews's counsel clarified that Mathews only seeks to recover for the November 1994 to May 1996 period.

had not shown he was a qualified individual, because he could not perform the journey-level mailer's job while he was under doctor's orders not to work with or around dangerous machinery. The court held that Mathews had not made a sufficiently specific request for accommodation by assignment to another position, and that the evidence to support Mathews's retaliation claim was "simply not here."

On appeal Mathews argues that the district court erred in holding that he was not disabled and that he was not qualified to do his job. He does not pursue the retaliation claim. Because we conclude that the district court ruled correctly on the qualification issue, we need not deal with the question of whether Mathews was disabled.

We review the district court's grant of summary judgment de novo. Frazier v. Simmons, 254 F.3d 1247, 1252 (10th Cir. 2001).

To sustain a claim under the ADA, Mathews must show that he (1) was disabled; (2) was qualified, that is, could perform the essential functions of the job in question, with or without accommodation; and (3) suffered adverse employment action because of the disability. Frazier, 254 F.3d at 1256. See generally 42 U.S.C. § 12112(a). We break down the question of whether a plaintiff is qualified into two steps:

> First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a

marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

Martin v. Kansas, 190 F.3d 1120, 1129-30 (10th Cir. 1999) (quoting Milton v. Scrivner, Inc., 53 F.3d 1118, 1123 (10th Cir. 1995)), overruled on other grounds, Bd. of Tr. of the Univ. of Ala. v. Garrett, 121 S. Ct. 955, 967-68 (2001).

The essential functions of a job are "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1) (2001). One way to establish that a function is essential is to show that the position exists to perform that function. 29 C.F.R. § 1630.2(n)(2)(i) (2001). Evidence bearing on the essential function question includes: the employer's judgment as to which functions are essential; written job descriptions in use by the employer; the amount of time spent on the job performing the function; and the consequences of not requiring the incumbent to perform the function. Frazier, 254 F.3d at 1258 (quoting from more extensive list at 29 C.F.R. § 1630.2(n)(3)).

The record in this case leaves no doubt that operating the insert machine and power dolly were essential functions of Mathews's job. The Post's job description for journey-level mailer listed five essential functions, two of which involved using or being around the insert machine and two of which involved

using the power dolly. Mathews admitted in his deposition that the job description for journey-level mailer was an accurate description of the job. He described the job himself: "Our job is--a mailer job is inserting pre-prints using the machine and hand inserts, preparing the newspaper for UPS shipping. We catch the paper from the press line." He also mentioned using the power dolly. The Post's personnel representative said, "There was no job in the mailroom that was not around heavy machinery."

Mathews admitted that he could not use the insert machine. When asked whether he could go back and do the same job he had done in August 1994, he said: "I have to answer that a yes and no because he write down not working on the dangerous machinery. So working on the machine is a part of the job, like I described to you what the jobs we do. So part of the job I could do, part of the job I may not." When asked, "Did you agree with not working around heavy machinery?" Mathews answered: "It is--yes, I agree with that."

Mathews now argues that he was not prohibited from using the power dolly, even though his doctor had specifically mentioned it as posing a danger. He says that his doctor said the power dolly "may pose problems" and by using the word "may" the doctor "invited the Denver Post and Mr. Mathews to use their common sense judgment about the potential consequences if a person using the dolly were to have a seizure." We cannot agree that it would be using common sense to

disregard the doctor's specific warning that allowing a person subject to grand mal seizures to work with a particular machine "may pose problems."

Similarly, Mathews contends that his doctor's advice changed at the time of the November 14, 1994 letter, making it permissible for Mathews to work around the machines. A fair reading of the November 14, 1994 letter and the April 12, 1995 letter is that Mathews was still in danger of falling into the machines. The Post tried to clarify the doctor's opinion by sending a job description and asking specific questions about whether Mathews could safely perform the job. The doctor then identified the insert machine and the power dolly as posing problems. Furthermore, Mathews himself wrote the Post's Employee Relations Manager as late as November 29, 1995, stating: "As you are probably aware, my doctor does not want me to drive or work around moving machinery." The Post interacted with Mathews in an attempt to find out what he could do, and both Mathews and his doctor led the Post to believe that it was unsafe for Mathews to operate the machinery. When the doctor's advice changed, the Post hired Mathews back.

Having determined that Mathews was unable to perform essential functions of the journey-level mailer job, we next determine whether he could have performed them with accommodation. Mathews argues that the Post should have accommodated his disability by allowing him to use his seniority to bid for shifts

that would not be using the insert machine.[1]  Mathews's union representative testified that some shifts in the mailroom might be primarily working on the press line, rather than the insert machine, and that Mathews had the seniority to bid for those shifts.  However, the union representative testified that  the workers on those shifts might still be called on to use the insert machine:  "You're not going to be on the inserting machine, you're going to be over here working on the press lines, but that doesn't mean if you come in on a press line, that you might not end on an inserting machine at some point during the night."  Mathews himself testified that even on a press line shift, he would have to use the insert machine when necessary to relieve others for lunch.  Mathews also admitted that he was obliged to work overtime when asked and said that "[m]ost of the overtime is on the insert machine."  Mathews also said that the press line shifts still involved using the power dolly.

The idea of accommodation is to enable an employee to perform the essential functions of his job; an employer is not required to accommodate a disabled worker by  modifying or eliminating an essential function of the job. Frazier, 254 F.3d at 1261; Martin, 190 F.3d at 1133; 29 C.F.R. pt. 1630 app. at §

---

[1]Mathews argues that the Post failed to participate in the interactive process of accommodating his disability, but he complains only that the Post should have modified the journey-level mailer job, not that there was some other existing position to which he should have been reassigned.

1630.2(o) (2001). Mathews and his union representative admitted that even journey-level mailers working on a press line shift were required to use the insert machine when it was necessary to relieve others and when they were required to work overtime. Additionally, the press line shifts were required to use the power dolly. An employer may require workers in a job classification to be able to rotate through a variety of functions as needed. Frazier, 254 F.3d at 1258-60; Martin, 190 F.3d at 1131-32; Anderson v. Coors Brewing Co., 181 F.3d 1171, 1176-77 (10th Cir. 1999). Mathews's proposal that he be permitted to perform only a portion of the essential duties of his position is "tantamount to asking [the Post] to provide a permanent light duty post." Martin, 190 F.3d at 1133. Accommodation does not require the employer to create a new job. Smith v. Midland Brake, Inc., 180 F.3d 1154, 1174 (10th Cir. 1999) (en banc); Anderson, 181 F.3d at 1177.

Because Mathews has not proved that he could perform the essential functions of his job during the time in question, he has not established that he was qualified for the job. We therefore must affirm the district court's entry of summary judgment for the Post.