**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 13, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KODY BROWN; MERI BROWN;
JANELLE BROWN; CHRISTINE
BROWN; ROBYN SULLIVAN,

     Plaintiffs - Appellees,

v.

JEFFREY R. BUHMAN,

     Defendant – Appellant.

------------------------------------------

EAGLE FORUM EDUCATION &
LEGAL DEFENSE FUND; SOUND
CHOICES COALITION, INC.; CATO
INSTITUTE,

     Amici Curiae.

No. 14-4117
(D.C. No. 2:11-CV-00652-CW)
(D. Utah)

_____

**ORDER**
_____

Before **MATHESON**, **BALDOCK**, and **MORITZ**, Circuit Judges.
_____

This matter is before the court on the appellees' *Petition for Rehearing En Banc*.

Upon consideration, any implicit request for panel rehearing is denied by the original

panel members. For clarification, however, the panel has decided, *sua sponte*, to amend

the original decision. A copy of the amended decision is attached to this order, and the clerk is directed to reissue the opinion nunc pro tunc to the original filing date.

The request for en banc rehearing and the amended opinion were also transmitted to all of the judges of the court who are in regular active service and who are not recused. As no member of the original panel or the en banc court requested that a poll be called, the petition for en banc review is denied.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KODY BROWN; MERI BROWN;
JANELLE BROWN; CHRISTINE
BROWN; ROBYN SULLIVAN,

      Plaintiffs - Appellees,

v.

JEFFREY R. BUHMAN,

      Defendant - Appellant,

--------------------------------

EAGLE FORUM EDUCATION &
LEGAL DEFENSE FUND; SOUND
CHOICES COALITION, INC.; CATO
INSTITUTE,

      Amici Curiae.

14-4117

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:11-CV-00652-CW)**
_____

Parker Douglas, Utah Federal Solicitor, Utah Attorney General's Office, Salt Lake City, Utah, appearing for Appellant.

Jonathan Turley, George Washington University School of Law, Washington, DC (Adam Alba, Magleby & Greenwood, Salt Lake City, Utah, with him on the briefs), appearing for Appellees.

Eugene Volokh, UCLA School of Law, Scott & Cyan Banister First Amendment Clinic, Los Angeles, California, and Ilya Shapiro, Cato Institute, Washington, DC, filed an amicus brief for Cato Institute.

Lawrence John Joseph, Law Office of Lawrence J. Joseph, Washington, DC, filed an amicus curiae brief for Eagle Forum Education & Legal Defense Fund.

Christian A. Kesselring, Wasatch Law Group, Heber City, Utah, filed an amicus curiae brief for Sound Choices Coalition, Inc.

_____

Before **MATHESON**, **BALDOCK**, and **MORITZ**, Circuit Judges.

_____

**MATHESON**, Circuit Judge

_____

## I. INTRODUCTION

This case concerns a constitutional challenge to Utah's bigamy statute, Utah Code Annotated § 76-7-101 ("the Statute"), which provides:

> (1) A person is guilty of bigamy when, knowing he has a husband or wife or knowing the other person has a husband or wife, the person purports to marry another person or cohabits with another person.
> (2) Bigamy is a felony of the third degree.
> (3) It shall be a defense to bigamy that the accused reasonably believed he and the other person were legally eligible to remarry.

Exercising jurisdiction under 28 U.S.C. § 1291, we hold this matter is moot. It is not a "Case" or "Controversy" under Article III of the U.S. Constitution. We remand to the district court with instructions to vacate the judgment and dismiss this action.

Kody Brown, Meri Brown, Janelle Brown, Christine Brown, and Robyn Sullivan ("the Browns") form a "plural family." Kody Brown is legally married to Meri Brown and "spiritually married" to the other three women, whom he calls "sister wives." When the family became the subject of a TLC reality television show in 2010, the Lehi Police Department opened an investigation of the Browns for violating the Statute. The Browns

- 2 -

then filed a 42 U.S.C. § 1983 action in federal district court against the Governor and Attorney General of the State of Utah and the Utah County Attorney. Claiming the Statute infringed their First and Fourteenth Amendment rights, the Browns sought declaratory relief and a permanent injunction enjoining enforcement of the Statute against them.

The district court dismissed the Governor and Attorney General. The Utah County Attorney's Office ("UCAO") subsequently closed its file on the Browns and adopted a policy ("the UCAO Policy") under which the Utah County Attorney will bring bigamy prosecutions only against those who (1) induce a partner to marry through misrepresentation or (2) are suspected of committing a collateral crime such as fraud or abuse. The Browns fall into neither category. Nonetheless, the district court denied the Utah County Attorney's motion to dismiss the case as moot and instead granted summary judgment to the Browns.

The district court erred by proceeding to the merits. Federal courts are courts of limited jurisdiction. They lack power to decide issues—however important or fiercely contested—that are detached from a live dispute between the parties. Following adoption of the UCAO Policy, the Browns' suit ceased to qualify as an Article III case or controversy. Their suit was moot before the district court awarded them relief, and the court therefore lacked jurisdiction to decide the Browns' claims.

## II. BACKGROUND

### A. *Factual Background*

Kody Brown, a former resident of Lehi, Utah, is legally married to Meri Brown. He is also "spiritually married"—but not legally married—to Janelle Brown, Christine Brown, and Robyn Sullivan, who "consider themselves committed to him as 'sister wives.'" App., Vol. 1 at 23, 37.[1] Together, the Browns form a "plural family." *Id.* at 36.

The Browns belong to the Apostolic United Brethren Church ("AUB"), which views polygamy as "a core religious practice." App., Vol. 3 at 564.[2] Consistent with AUB teaching, they "believe that only through celestial marriage can they ensure the salvation of their souls following death." App., Vol. 1 at 36.

In September 2010, TLC began airing "Sister Wives," a reality television show featuring the Browns that "explores the daily issues and realities of a plural family." App., Vol. 3 at 565. On the show, the Browns have discussed their religious belief in polygamy and defended their polygamist lifestyle.

---

[1] It is unclear from the record exactly what the Browns mean by "spiritual marriage." According to the complaint, "Kody Brown considered himself committed to his Co-Plaintiffs as head of the plural family, a position imposing on him the duty to raise and father children with each of his spiritual wives." App., Vol. 1 at 37.

[2] The Statute refers to "bigamy" rather than "polygamy," Utah Code Ann. § 76-7-101(1), although liability extends to defendants with more than two spouses, *see, e.g.*, *State v. Green*, 99 P.3d 820, 822 (Utah 2004). For purposes of this opinion, the difference between bigamy and polygamy is immaterial. We therefore use the terms interchangeably.

Viewers of the show contacted the Lehi Police Department to "inquir[e] what the department intended to do" about the Browns. App., Vol. 2 at 246. The day after the first episode aired, the Department publicly announced it was investigating the Browns for violations of the Statute.

In October 2010, the Lehi Police Department forwarded the results of its investigation to the UCAO. Following standard practice, the UCAO opened a case file on the Browns. Fearful they would be criminally prosecuted, the Browns moved to Nevada in January 2011. Mr. Buhman was quoted in a January 2011 media report as saying that despite the Browns' move, his office would not rule out the possibility of prosecution.

## B. *Procedural Background*

### 1. **The Browns' Complaint**

On July 13, 2011, before the UCAO had completed its investigation, the Browns filed suit in the U.S. District Court for the District of Utah. Their complaint named Jeffrey Buhman, County Attorney for Utah County; Gary Herbert, Governor of the State of Utah; and Mark Shurtleff, Attorney General of the State of Utah (collectively, "Defendants"), all in their official capacities.

The Browns alleged the Statute violates (1) their substantive due process right "to freely make personal decisions relating to procreation, contraception, family relationships, and child rearing," both on its face and as applied, and the due process right not to be subject to vague criminal laws, App., Vol. 1 at 47; (2) the Equal Protection Clause, both on its face and as applied, because it treats religiously motivated

polygamists differently from other people; (3) their right to the free exercise of religion, both on its face and as applied; (4) their free speech rights because prosecutors used the Statute to single them out based on their public statements endorsing polygamy; (5) their freedom of association, both on its face and as applied, because its application has deprived the Browns of "the right to associate with other like-minded citizens who believe that consenting adults should be able to maintain private relations and unions without interference from the state," *id.* at 52; and (6) the Establishment Clause of the First Amendment. In their seventh and final cause of action, the Browns asserted Defendants were "in violation of 42 U.S.C. § 1983" because they had deprived the Browns of their constitutional rights while acting under color of state law. *Id.* at 53.

The Browns' prayer for relief requested (1) a "declar[ation] that [the Statute] violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment, the Free Exercise, Establishment, Free Speech, and Freedom of Association Clauses of the First Amendment, and 42 U.S.C. § 1983"; (2) a "preliminary and permanent injunction enjoining enforcement or application of [the Statute] against the Brown family"; (3) an award of "reasonable attorneys' fees and costs incurred in maintaining this action"; and (4) "such other relief as [the district court] may deem just and proper." *Id.* at 54.

In asserting the district court's jurisdiction under 28 U.S.C. § 1343(a)(4), the complaint explained that "this action seeks equitable relief under 42 U.S.C. § 1983, an Act of Congress." *Id.* at 19. Additionally, the complaint's "Nature of the Action" section provides, "Through this action, pursuant to 42 U.S.C. § 1983, the Brown family seeks a declaration that [the Statute] is unconstitutional . . . . The Browns further seek a

preliminary and permanent injunction preventing the Defendants from enforcing the [Statute] against the Browns." *Id.* at 19-20. The complaint expressly disclaimed any request for a declaration that the Statute and the Utah Constitution "are unconstitutional to the extent that they merely prohibit the official recognition of polygamous marriage or the acquisition of multiple state marriage licenses." *Id.* at 20. Finally, the complaint did not request money damages.

## 2. **Defendants' Motions to Dismiss**

Defendants filed two separate motions to dismiss in district court. One was granted in part; the other was denied.

### a. *Defendants' Motion to Dismiss for Lack of Standing*

On September 2, 2011, Defendants filed a motion to dismiss, arguing the Browns lacked standing to press their claims.

Attached to that motion was a declaration signed by Mr. Shurtleff,[3] in which he declared his office had a "policy . . . not to prosecute polygamists under Utah's criminal bigamy statute for just the sake of their practicing polygamy" ("the AG Policy"). *Id.* at 77. Under the AG Policy, Mr. Shurtleff's office initiates prosecutions under the Statute only against someone who also "commit[s] child or spouse abuse, domestic violence, welfare fraud, or any other crime." *Id.* He said his "predecessors in recent memory" had

---

[3] 28 U.S.C. § 1746(2) provides for a declaration subscribed to "under penalty of perjury" to have the same "force and effect" as a "sworn declaration, verification, certificate, statement, oath, or affidavit." The declarations filed by Mr. Shurtleff and Mr. Buhman in this case were subscribed to "under penalty of perjury."

followed the AG Policy, and he was unaware of cases brought "against a polygamist just for violating the bigamy law in the last fifty years unless it is in conjunction with another crime." *Id.* at 78. In addition, Mr. Shurtleff attested "[i]t [wa]s not the intent of the Utah Attorney General's Office to prosecute the Browns for their practice of polygamy while they were living in Lehi, Utah, unless it [wa]s found that they were also committing some other crime worthy of prosecution." *Id.* at 79.

Defendants also attached a declaration from Mr. Buhman signed under penalty of perjury. Although the UCAO "d[id] not have a formal, declared policy regarding prosecution of polygamy," he said no one on his staff "ha[d] any recollection of [the UCAO] having ever prosecuted anyone for polygamy." *Id.* at 74. He added, however, that he had "not stated publically that [he] w[ould] or w[ould] not prosecute the Browns." *Id.* Mr. Buhman also declared that the UCAO "has on occasion prosecuted a bigamy case for marriage fraud or for a failure to get divorced before remarrying." *Id.* at 75. "Were the Browns committing other crimes, such as spousal or child abuse, welfare fraud or the like," he stated, "the chance of prosecution would be likely." *Id.*

Defendants argued the Browns lacked standing because the AG Policy and the UCAO's non-enforcement of the Statute made prosecution unlikely.

On December 19, 2011, Defendants supplemented the record with a declaration from Amanda Jex, a law clerk in the Attorney General's Office who had been "assigned the task of researching prosecution of polygamists in Utah subsequent to their public appearances." *Id.* at 176. She had asked the Administrative Office of the Courts for the State of Utah to provide a list of cases brought under the Statute in the preceding ten

years.  The Administrative Office responded with a list of ten defendants prosecuted under the Statute between 2001 and 2011.  The list did not indicate whether defendants charged under the Statute were also charged with collateral crimes.

To determine whether those ten defendants had also been charged with collateral crimes, Ms. Jex ran "internet queries through Google.com, and Utah based news agencies such as:  KSL.com, the Salt Lake Tribune, the Deseret News and The Spectrum."  *Id.* She also conducted research on Court XChange, an online database operated by the Utah courts.  Her declaration does not indicate whether she checked actual court dockets or records or contacted court clerk's offices for information.  There is no evidence in the record regarding prosecutions before 2001.

Of the ten cases Ms. Jex identified in her declaration, six—including two in Utah County—involved defendants who were also prosecuted for crimes other than bigamy, such as criminal non-support, unlawful sexual conduct with a minor, forcible sex abuse, marriage license fraud, and insurance fraud.  Ms. Jex's "internet queries" did not reveal additional charges in the four remaining cases, one of which involved a defendant charged in Utah County in 2010.  But prosecutors dismissed the charges in three of those cases, including the Utah County case.  The final defendant was found guilty in Weber County of "[a]ttempted bigamy."  App., Vol. 1 at 179.

On February 3, 2012, the district court dismissed Governor Herbert and Attorney General Shurtleff, concluding, based on the latter's declaration, that "nothing suggest[s] that the State of Utah has taken any action towards [the Browns] that could be interpreted as threatening prosecution."  *Brown v. Herbert*, 850 F. Supp. 2d 1240, 1249 (D. Utah

2012).  But the court denied dismissal of Mr. Buhman.  *Id.* at 1244.  Noting the UCAO's

lack of an official prosecution policy, the court said, "Mr. Buhman ha[d] submitted

nothing to the court that either counters [the Browns'] account of the events, or otherwise

suggests that the prosecutorial door is not wide open."  *Id.* at 1251.  The Browns faced "a

credible threat of prosecution," the court concluded, and therefore had standing to bring

their claims.  *Id.* at 1252.

>    b. *Mr. Buhman's Motion to Dismiss for Mootness*

Four months later, on May 31, 2012, Mr. Buhman filed a motion to dismiss the

Browns' suit as constitutionally moot.  The motion was based on a second declaration

Mr. Buhman had signed on May 22, 2012, in which he announced he had "now adopted a

formal office policy" regarding polygamy prosecutions—the UCAO Policy.  App., Vol. 2

at 329.  The UCAO Policy, which essentially adopts the AG Policy, provides:

> Prosecution of Bigamy Crimes:
>
> The Utah County Attorney's Office will prosecute the crime of bigamy
> under [the Statute] in two circumstances: (1) When a victim is induced to
> marry through their partner's fraud, misrepresentation or omissions; or (2)
> When a person purports to marry or cohabits with another person in
> violation of [the Statute] and is also engaged in some type of abuse,
> violence or fraud.  This office will prosecute the crime of child bigamy
> under Section 76-7-101.5 regardless of whether one of the parties is also
> engaged in some type of abuse, violence or fraud.

*Id.*  According to Mr. Buhman's declaration, the UCAO Policy was "intended . . . to

prevent the future prosecution in Utah County of bigamous marriages entered into for

religious reasons."  *Id.*

- 10 -

Mr. Buhman also attested that the UCAO "ha[d] concluded its investigation of the Browns and ha[d] determined that no other prosecutable crimes related to the bigamy allegation have been or are being committed by the Browns in Utah County as of the date of this declaration." *Id.* As a result, he wrote, "the criminal case against the Browns is closed and no charges will be filed against them for bigamy unless new evidence is discovered which would comport with the [UCAO Policy] pertaining to the prosecution of bigamy crimes." *Id.* at 330. The district court concluded in its subsequent summary judgment order and memorandum that it was undisputed Mr. Buhman had "found no evidence of any crime by the Browns." App., Vol. 3 at 566.

On August 17, 2012, the district court denied Mr. Buhman's motion. It reasoned that the "timing of Mr. Buhman's adoption of the [UCAO Policy]"—18 months after "Sister Wives" began airing and four months after the initial motion to dismiss was denied—suggested a "strategic attempt to use the mootness doctrine to evade review." App., Vol. 2 at 493. The court also noted that the UCAO Policy "does not reject the ability of Utah County to prosecute under the anti-bigamy statute" and "reflects, at most, an exercise of prosecutorial discretion." *Id.* at 494. Accordingly, the court denied the Browns' case was constitutionally moot because it could not "conclude that there is no reasonable expectation that [the Browns] would be prosecuted under the statute in the future." *Id.* at 496.

Taking up the question of prudential mootness sua sponte, the district court concluded similar considerations counseled against dismissing the case on that basis.[4] The district court wrote that "the timing of the [UCAO Policy] implementation, lack of any public notice, and lack of reasoning given for adopting the [UCAO Policy] suggest that the [UCAO Policy] was implemented, not to provide a remedy to [the Browns] in this case, but instead to evade review of [the Browns'] claims on the merits." *Id.* at 498.

3. **Cross-Motions for Summary Judgment**

On May 31, 2012, the Browns filed a motion for summary judgment on all claims. Mr. Buhman filed a cross-motion for summary judgment.

On December 13, 2013, the district court entered a lengthy order granting the Browns' motion for summary judgment and denying Mr. Buhman's cross-motion. *Brown v. Buhman*, 947 F. Supp. 2d 1170, 1176 (D. Utah 2013). That order first addressed the Statute's "cohabitation prong," which imposes criminal liability on a person who, "knowing he has a husband or wife or knowing the other person has a husband or wife, . . . cohabits with another person." Utah Code Ann. § 76-7-101(1). The court held this portion of the Statute violated the First Amendment's Free Exercise Clause, lacked a rational basis under the Fourteenth Amendment Due Process clause, and

---

[4] "Courts recognize two kinds of mootness: constitutional mootness and prudential mootness." *Jordan v. Sosa*, 654 F.3d 1012, 1023 (10th Cir. 2011) (brackets and quotation omitted). "Even if a case is not constitutionally moot, a court may dismiss a case under the prudential-mootness doctrine if the case is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the *power* to grant." *Id.* at 1024 (emphasis in original) (brackets and quotations omitted).

was void for vagueness.  *Id.* at 1176, 1226.  In addition, the court concluded the Browns'

remaining claims—those based on freedom of association, freedom of speech, equal

protection, and the Establishment Clause—were at least "colorable," entitling the Browns

to relief under the "hybrid rights" theory of religious free exercise.  *Id.* at 1222.[5]  The

court therefore determined the cohabitation prong had to be "stricken" from the Statute.

*Id.*

Having struck the cohabitation prong, the court turned to the Statute's "purports to

marry" prong, which states, "A person is guilty of bigamy when, knowing he has a

husband or wife or knowing the other person has a husband or wife, the person purports

to marry another person."  Utah Code Ann. § 76-7-101(1).  The Utah Supreme Court had

previously held that under this portion of the Statute, liability attaches when a couple

hold themselves out as married, even if they do not profess to be *legally* married.  *State v.*

*Holm*, 137 P.3d 726, 732 (Utah 2006).  The district court acknowledged *Holm*'s holding

but concluded that "[u]nder this broad interpretation of the term 'marry,' the phrase

'purports to marry another person' raises the same constitutional concerns addressed in

_____

[5] Neutral, generally applicable laws that incidentally burden religious free exercise will ordinarily survive constitutional challenge as long as they are rationally related to a legitimate government interest.  *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006).  But under the hybrid rights doctrine, "a party c[an] establish a violation of the free exercise clause even in the case of a neutral law of general applicability by showing that the challenged governmental action compromised both the right to free exercise of religion and an independent constitutional right."  *Id.* at 655.  The "hybrid-rights theory at least requires a colorable showing of infringement of a companion constitutional right."  *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295 (10th Cir. 2004) (quotation omitted).

relation to the cohabitation prong." *Brown*, 947 F. Supp. 2d at 1192, 1226. It therefore

adopted a "narrowing construction" that interprets "purports to marry" as "referring to an

individual's claim of entry into a legal union recognized by the state as marriage." *Id.* at

1231 (quoting *Holm*, 137 P.3d at 763 (Durham, C.J., concurring in part and dissenting in

part)).[6] The court held that, as construed—with the cohabitation prong stricken and the

"purport to marry" prong narrowed—the Statute survives constitutional scrutiny. *Id.* at

1233-34.

The district court entered judgment in favor of the Browns on December 17, 2013,

but did not order injunctive relief.[7]

---

[6] The court did not explain where it derived the authority to construe a state statute differently from how the state's highest court had construed it. *See Johnson v. United States*, 559 U.S. 133, 138 (2010) ("We are, however, bound by the Florida Supreme Court's interpretation of state law, including its determination of the elements of Fla. Stat. § 784.03(2)."); *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013) ("It is axiomatic that state courts are the final arbiters of state law." (quotation omitted)). Even if adopting an alternative construction might avert possible constitutional problems, federal courts must defer to states' interpretations of their own statutes. *See Am. Constitutional Law Found., Inc. v. Meyer*, 120 F.3d 1092, 1106 (10th Cir. 1997) (instructing, in void-for-vagueness case, that "[w]e must read the statute as it has been interpreted by Colorado's highest court"); *United States v. Gaudreau*, 860 F.2d 357, 361 (10th Cir. 1988) ("[A] federal court evaluating a vagueness challenge to a state law must read the statute as it is interpreted by the state's highest court." (citing *Wainwright v. Stone*, 414 U.S. 21, 22-23 (1973))).

[7] Like the court's December 13, 2013 order, the judgment announces that the Statute's cohabitation prong "is stricken" and the "purports to marry" prong is "susceptible to a narrowing construction." App., Vol. 3 at 651. Both documents grant the Browns' summary judgment motion in part and deny Mr. Buhman's cross-motion, but neither expressly enjoins Mr. Buhman from enforcing the Statute against the Browns. In practical effect, therefore, the district court granted the Browns only one of their requested forms of relief, namely a declaration that the Statute's cohabitation prong violates the First and Fourteenth Amendments.

- 14 -

4. **Proceedings on "the § 1983 Claim"**

The district court vacated its judgment sua sponte on December 20, 2013, because it had not yet resolved "the status of the 42 U.S.C. 1983 claim." Dist. Ct. Doc. 84. After ordering supplemental briefing, the district court, on August 27, 2014, held that Mr. Buhman had waived qualified immunity and prosecutorial immunity defenses by failing to plead them in his answer or argue them in the summary judgment briefing.[8] The court "therefore f[ound] in favor of [the Browns] on their seventh and final count in the Complaint under 42 U.S.C. § 1983 and [granted] summary judgment in their favor on this last remaining count." App., Vol. 3 at 728.[9] It construed the complaint to include a

_____

[8] This holding was erroneous. Immunity defenses are not available—and therefore cannot be waived—in suits seeking relief against a public official only in his or her official capacity. *Cox v. Glanz*, 800 F.3d 1231, 1239 n.1 (10th Cir. 2015) ("The defense of qualified immunity is available only in suits against officials sued in their personal capacities, not in suits against . . . officials sued in their official capacities.") (quotation omitted) (ellipsis in original)); *Lemmons v. Law Firm of Morris & Morris*, 39 F.3d 264, 267 (10th Cir. 1994) ("[N]either qualified *nor absolute* immunity precludes prospective *injunctive relief* except in rare circumstances not relevant here." (emphasis in original)); *see also* Martin A. Schwartz, Section 1983 Litigation Claims and Defenses § 9.01[3] (3d ed. 2005) ("The common-law absolute and qualified immunities that have been recognized in § 1983 actions pertain to claims for monetary relief against state and local officials in their personal capacities. Neither the absolute nor qualified immunities extend to suits for injunctive or declaratory relief under § 1983.") (footnote omitted)).

[9] The Browns and the district court misapprehended the relationship between § 1983 and the Defendants' alleged constitutional violations. "Section 1983 itself does not create any substantive rights, but merely provides relief against those who, acting under color of law, violate federal rights created elsewhere." *Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1536 (10th Cir. 1995). That is, § 1983 is a remedial vehicle for raising claims based on the violation of constitutional rights. There can be no "violation" of § 1983 separate and apart from the underlying constitutional violations. *See Sanchez v. Hartley*, 810 F.3d 750, 759 (10th Cir. 2016) ("Section 1983 merely provides a cause of action; the substantive rights are created elsewhere."); *accord* Schwartz, *supra* note 8, § 1.05[B] ("Section 1983 fulfills the procedural or remedial role

Continued . . .

- 15 -

request for money damages but determined the Browns had "drop[ped]" this request in

their supplemental briefing. *Id.* at 728.[10] Accordingly, the court awarded the Browns

of authorizing the assertion of the claim for relief but does not itself create or establish substantive rights. Thus, one cannot go into court and claim a violation of § 1983—for § 1983 by itself does not protect anyone against anything." (quotations omitted)). Accordingly, the Browns' first six claims could be brought only under § 1983, and claim seven is redundant of those claims.

[10] Our review of the complaint reveals no request for money damages. Nor could there be such a request, as the Browns sued Defendants in their official and not their individual capacities. With respect to state officials, such as Mr. Herbert and Mr. Shurtleff, "[s]ection 1983 plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief." *Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011) (citing *Hafer v. Melo*, 502 U.S. 21, 30 (1991)); *see also* Richard H. Fallon, Jr. et al., Hart and Wechsler's The Federal Courts and the Federal System 958 (6th ed. 2009) ("[D]amages actions pleaded against state officials in their 'official capacity' will ordinarily be dismissed as barred by the state's sovereign immunity. . . . When *equitable relief* is sought, the defendant official is ordinarily named in an official capacity." (emphasis in original)).

Assuming he is a municipal official, matters are more complicated as to Mr. Buhman. (If he is instead a state official, the Browns could not seek damages against him for the same reason they could not seek damages against Mr. Herbert and Mr. Shurtleff.)

"The Supreme Court has determined that an official-capacity suit brought under § 1983 generally represents only another way of pleading an action against an entity of which an officer is an agent, and as long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Moss v. Kopp*, 559 F.3d 1155, 1168 n.13 (10th Cir. 2009) (quotations and brackets omitted). "To establish a claim for damages under § 1983 against municipal entities or local government bodies, the plaintiff must prove (1) the entity executed a policy or custom (2) that caused the plaintiff to suffer deprivation of constitutional or other federal rights." *Id.* at 1168. Here, the Browns did not allege or attempt to prove in district court that Mr. Buhman acted in accordance with a Utah County policy or custom. Damages were therefore unavailable under § 1983. *See* Fallon, et al., *supra*, at 958-62 (explaining that "[d]amages actions against local government officers in their official capacities can go forward only [in] accordance with the rules governing local governmental liability described in" *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which conditions liability on action taken under an official policy or a de facto custom).

only "attorney's fees, costs, and expenses incurred in this action under 42 U.S.C. § 1988," *id.* at 730, which authorizes such fees and costs in § 1983 suits.

An amended final judgment was entered the same day.[11]  Mr. Buhman filed a timely notice of appeal on September 24, 2014.  *See* Fed. R. App. 4(a)(1)(A).

III. **DISCUSSION**

Mr. Buhman appeals the district court's grant of summary judgment to the Browns.  He argues the district court erred by (1) finding a free exercise violation despite controlling precedent holding polygamy bans do not offend the Free Exercise Clause, (2) concluding the Statute's prohibition of "religious cohabitation" lacks a rational basis under the Due Process Clause, and 3) awarding relief on the Browns' "hybrid rights" claims.

On December 11, 2015, we ordered the parties to submit supplemental briefing addressing (1) whether the Browns had standing at the time the complaint was filed, and (2) if so, whether the UCAO Policy rendered the Browns' claims moot.

We do not address the merits of the Browns' claims.  The district court should not have done so, either.  Assuming the Browns had standing as to Mr. Buhman when they filed suit, they ceased to have standing when Mr. Buhman filed his May 2012

---

[11] This judgment, like the first, does not enjoin enforcement of the Statute.  It only announces the district court's view that the cohabitation prong of the Statute is unconstitutional and the "purports to marry" prong can be saved only by adopting a narrowing construction.

declaration, and this case therefore became moot.[12]  The declaration rendered the threat of prosecution so speculative that a live controversy no longer existed for Article III jurisdiction.  We therefore remand to the district court with directions to vacate the judgment and dismiss this case.

### A.  *Standing and Mootness*

The U.S. Constitution delegates certain powers to each branch of the federal government and places limits on those powers.  Article III vests "[t]he judicial Power of the United States . . . in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. Const. art. III, § 1.

Federal courts exercising this authority are "confine[d] . . . to deciding actual 'Cases' or 'Controversies.'"  *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013) (quoting U.S. Const. art. III, § 2).  "In our system of government, courts have no business deciding legal disputes or expounding on law in the absence of such a case or controversy."  *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013) (quotation omitted).  "As used in the Constitution, those words do not include every sort of dispute, but only those historically viewed as capable of resolution through the judicial process."  *Hollingsworth*, 133 S. Ct. at 2659 (quotation omitted).

---

[12] "Mootness and standing are jurisdictional. Because there is no mandatory sequencing of nonmerits issues, we have leeway to choose among threshold grounds for denying audience to a case on the merits."  *Citizen Ctr. v. Gessler*, 770 F.3d 900, 906 (10th Cir. 2014) (quotations, citation, and brackets omitted).  Accordingly, we may address mootness without deciding whether the Browns had standing.

- 18 -

As the Supreme Court has explained, "no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l, USA*, 133 S. Ct. 1138, 1146 (2013) (brackets omitted); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 492-93 (2009) ("This limitation is founded in concern about the proper—and properly limited—role of the courts in a democratic society." (quotation omitted)). The narrow scope of Article III, "which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014); *see also Hollingsworth*, 133 S. Ct. at 2659 ("[The case-or-controversy requirement] is an essential limit on our power: It ensures that we act *as judges,* and do not engage in policymaking properly left to elected representatives." (emphasis in original)).

Two related doctrines, standing and mootness, keep federal courts within their constitutional bounds. Standing concerns whether a plaintiff's action qualifies as a case or controversy when it is filed; mootness ensures it remains one at the time a court renders its decision.[13] The Supreme Court has described mootness "as the doctrine of

---

[13] A third jurisdictional doctrine, known as ripeness, "aims to prevent courts from entangling themselves in abstract disagreements by avoiding premature adjudication." *Cellport Sys., Inc. v. Peiker Acustic GMBH & Co.* KG, 762 F.3d 1016, 1029 (10th Cir. 2014) (quotation omitted); *see also Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). "Even if all the relevant facts regarding a particular legal issue are known or knowable, a court does not have jurisdiction to resolve the issue unless that issue arises in a specific dispute having real-world consequences." *Cellport Sys.*, 762 F.3d at 1029 (brackets and quotation omitted). "The doctrines of standing and ripeness originate from the same

Continued . . .

- 19 -

standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (quotations omitted).[14]  Failure to satisfy the requirements of either doctrine places a dispute outside the reach of the federal courts.  *See Already*, 133 S. Ct. at 726 ("We have repeatedly held that an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." (quotation omitted)).

We discuss standing and mootness in turn.

1.  **Standing**

Standing "requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction."  *Summers*, 555 U.S. at 493 (emphasis in original) (quotations omitted).

---

Article III limitation."  *Susan B. Anthony List*, 134 S. Ct. at 2341 n.5 (quotations omitted).

[14] The Court has cautioned that the "time frame" description of mootness "is not comprehensive."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).  In particular, "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness."  *Id.*  Standing, unlike mootness, is also not subject to an exception for disputes that are "capable of repetition yet evading review," which we discuss below.  *Id.* at 191.  These caveats, however, do not affect the general rule that "[t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."  *Arizonans for Official English*, 520 U.S. at 68 n.22.

We measure standing as of the time the plaintiff files suit. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732-33 (2008). The burden is on the plaintiff to establish standing. *Summers*, 555 U.S. at 493; *see Bennett v. Spear*, 520 U.S. 154, 167-68 (1997) ("[E]ach element of Article III standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." (quotation omitted)).

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List*, 134 S. Ct. at 2341 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)) (brackets omitted). These three elements—"injury in fact," "causation," and "redressability"—"together constitute the irreducible constitutional minimum of standing." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (quotation omitted).

This case centers on the injury-in-fact requirement. "An injury sufficient to satisfy Article III must be concrete and particularized and actual or imminent, not conjectural or hypothetical. An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List*, 134 S. Ct. at 2341 (quotations omitted).

When a plaintiff alleges injury arising from the potential future enforcement of a criminal statute, "an actual arrest, prosecution, or other enforcement action is not a

prerequisite to challenging the law." *Id.* at 2342. Instead, "a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* (quotation omitted); *see also Mink v. Suthers*, 482 F.3d 1244, 1253 (10th Cir. 2007) ("[T]he mere presence on the statute books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct prohibited by the statute." (quotation omitted)). A credible threat is one that is "well-founded" and "not 'imaginary or wholly speculative.'" *Susan B. Anthony List*, 134 S. Ct. at 2343 (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988), and *Babbitt v. Farm Workers*, 442 U.S. 289, 302 (1979)). "In other words, to satisfy Article III, the plaintiff's expressive activities must be inhibited by an objectively justified fear of real consequences." *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006) (quotation omitted).

2. **Mootness**

a. *General Principles*

A plaintiff's standing at the time of filing does not ensure the court will ultimately be able to decide the case on the merits. An "actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1528 (2013) (quotations and citations omitted). "If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be

- 22 -

dismissed as moot." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) (quotation omitted). Mootness deprives federal courts of jurisdiction. *See Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1336 (2013); *Schell v. OXY USA, Inc.*, 814 F.3d 1107, 1114 (10th Cir. 2016) ("If a case is moot, we have no subject-matter jurisdiction.").[15]

A "suit becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) (quotation and comma omitted). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Already*, 133 S. Ct. at 727 (quotation omitted). "The crucial question is whether granting a present determination of the issues offered will have some effect in the real world." *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005). "Put another way, a case becomes moot when a plaintiff no longer suffers actual injury that can be redressed by a favorable judicial decision." *Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1213 (10th Cir. 2015) (quotations omitted).

b. *Exceptions*

Courts recognize two "exceptions" to the mootness doctrine—situations in which a case remains subject to federal court jurisdiction notwithstanding the seeming extinguishment of any live case or controversy.

---

[15] Constitutional mootness is jurisdictional; prudential mootness is discretionary. *See Jordan*, 654 F.3d at 1024. Because we conclude the Browns' claim is constitutionally moot, we do not address prudential mootness in this opinion.

One exception involves disputes that are "capable of repetition, yet evading review." "The exception applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007); *see also* Erwin Chemerinsky, Federal Jurisdiction 137 (6th ed. 2012) (explaining that this exception addresses instances where "injuries occur and are over so quickly that they always will be moot before the federal court litigation process is completed"). Disputes regarding regulation of abortion, for example, are capable of repetition yet evade review because "the normal 266-day human gestation period is so short that the pregnancy will come to term before the usual appellate process is complete. If that termination makes a case moot, pregnancy litigation seldom will survive much beyond the trial stage, and appellate review will be effectively denied." *Roe v. Wade*, 410 U.S. 113, 125 (1973). Mooting this case would not run afoul of the "capable of repetition" exception because any renewed threat of prosecution would leave the Browns ample time and opportunity to challenge the Statute.

The second exception to mootness, relevant here, concerns "voluntary cessation" of the defendant's conduct. *Already*, 133 S. Ct. at 727. Under this exception, "voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012). This rule is designed to prevent gamesmanship. If voluntary cessation

- 24 -

automatically mooted a case, "a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already*, 133 S. Ct. at 727. The voluntary cessation rule "traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001). Courts therefore view voluntary cessation "with a critical eye," lest defendants manipulate jurisdiction to "insulate" their conduct from judicial review. *Knox*, 132 S. Ct. at 2287.

A defendant's voluntary cessation may moot a case, however, if the defendant carries "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Already*, 133 S. Ct. at 727 (quotation omitted).[16] The Supreme Court has described this burden as "heavy," *Parents*

---

[16] The Supreme Court's voluntary cessation cases suggest the word "absolutely" adds little to this formulation. After reciting this standard, the Court sometimes omits "absolutely" from its subsequent analysis, instead using the "reasonably be expected" language as shorthand. *See Already*, 133 S. Ct. at 727 ("Under our precedents, it was Nike's burden to show that it 'could not reasonably be expected' to resume its enforcement efforts against Already." (quotation omitted)); *id.* ("That is the question the voluntary cessation doctrine poses: Could the allegedly wrongful behavior reasonably be expected to recur?"); *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) ("The underlying concern is that, when the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated, then it becomes impossible for the court to grant any effectual relief whatever to the prevailing party." (citation, quotations, and brackets omitted)); *Friends of the Earth*, 528 U.S. at 189 ("The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." (quotation and brackets omitted)); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 676 (1993) ("[W]e have said that the defendant, to establish mootness, bears a heavy burden of demonstrat[ing] that there is no reasonable

Continued . . .

- 25 -

*Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007), and

"stringent," *Friends of the Earth*, 528 U.S. at 189.[17]

But the burden is not insurmountable, especially in the context of government

enforcement. "In practice, [this] heavy burden frequently has not prevented

governmental officials from discontinuing challenged practices and mooting a case." *Rio*

*Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1116 (10th Cir. 2010).

Most cases that deny mootness following government officials' voluntary cessation "rely

on *clear showings* of reluctant submission [by governmental actors] and a desire to return

to the old ways.'" *Id.* at 1117 (brackets and emphasis in *Rio Grande Silvery Minnow*)

(quoting 13C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal

---

expectation that the wrong will be repeated." (quotation omitted) (second brackets in original)). *But see Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (1998) ("Voluntary cessation of challenged conduct moots a case, however, only if it is *absolutely* clear that the allegedly wrongful behavior could not reasonably be expected to recur." (quotation omitted) (emphasis in original)). Moreover, although the defendant's obligation is to show it is absolutely clear that "the allegedly wrongful behavior could not reasonably be expected to recur," the Supreme Court has never suggested a defendant must make resumption of his conduct impossible.

[17] Although a defendant's "burden" may be heavy, it is also narrow in scope. "[M]ootness is jurisdictional and non-waivable." *Winsness*, 433 F.3d at 736 n.4. When we suspect a case may be moot, we must study the question closely and conduct our own assessment, *United States v. Hays*, 515 U.S. 737, 742 (1995) ("[F]ederal courts are under an independent obligation to examine their own jurisdiction."), even if the defendant has made no efforts—or very poor ones—to convince us. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) ("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived."). Thus, a defendant's burden is limited to bringing forward information relevant to mootness. Failure to make persuasive arguments based on that information cannot defeat mootness.

Practice and Procedure, § 3533.6, at 311 (3d ed. 2008)); *see also Gessler*, 770 F.3d at 908 (same).

We have cited with approval the Fifth Circuit's decision, in the government enforcement context, "not [to] require some physical or logical impossibility that the challenged policy will be reenacted absent evidence that the voluntary cessation is a sham for continuing possibly unlawful conduct." *Rio Grande Silvery Minnow*, 601 F.3d at 1117-18 (quoting *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009)). And we have indicated that government "self-correction . . . provides a secure foundation for mootness so long as it seems genuine." *Id.* at 1118 (quoting Wright, Miller & Cooper, § 3533.7, at 326).

### B. *Standard of Review*

"We review issues of standing de novo, accepting as true all material allegations of the complaint, and . . . construing the complaint in favor of the complaining party." *Winsness*, 433 F.3d at 732 (quotations and brackets omitted) (ellipsis in original). "We review mootness de novo as a legal question." *United States v. Fisher*, 805 F.3d 982, 989 (10th Cir. 2015). Mootness in this case turns on whether, following Mr. Buhman's May 22, 2012 declaration, his allegedly unconstitutional conduct could "reasonably be expected to recur," which is "squarely a legal determination." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1188 n.15 (11th Cir. 2007).

We have addressed the standard of review for mootness based on voluntary cessation, stating that "courts must assess the likelihood that defendants will recommence the challenged, allegedly offensive conduct." *Rio Grande Silvery Minnow*, 601 F.3d at

- 27 -

1122. We referred to this assessment as a "factual inquir[y]" and said "[o]ur review of this question is *de novo*." *Id.* (quotation omitted).

As to mootness in this case, no evidentiary hearing was held, the parties did not contest the facts in each other's declarations, and the district court needed only to resolve the legal question of mootness, not resolve disputed issues of fact relating to justiciability. Whether our consideration of the underlying facts is plenary or deferential, we conclude the Browns faced no credible threat of prosecution once Mr. Buhman submitted his declaration announcing the UCAO Policy. At that point, their case became moot.

## C. *Analysis*

We assume without deciding that when the Browns filed their complaint, they had standing as to Mr. Buhman; that is, they were suffering an injury in fact—namely, "a credible threat of prosecution" under the Statute, *Susan B. Anthony List*, 134 S. Ct. at 2342—caused by Mr. Buhman and redressable by him. But the district court lost jurisdiction after May 2012, when Mr. Buhman submitted a declaration announcing the UCAO Policy. That policy forbids enforcing the Statute against the Browns, making it clear that prosecution of the Browns "could not reasonably be expected to recur." *Already*, 133 S. Ct. at 727 (quotation omitted). The UCAO Policy rendered this case

moot, and, as we discuss below, the voluntary cessation exception to mootness does not apply.[18]

1. **The Browns' Case Is Moot Because They Are Under No Credible Threat of Prosecution**

Our mootness analysis proceeds in three parts. First, the Browns' complaint seeks only prospective relief, and mootness therefore turns on whether the district court had authority to enjoin future alleged constitutional violations. Second, because Mr. Buhman's declaration and the Browns' move to Nevada eliminated any reasonable expectation that the Browns will be prosecuted, we conclude the district court lacked such authority. Third, the Browns' arguments against mootness—that (1) *Winsness*, in which we found mootness, requires a different result here; (2) Mr. Buhman's successor could abandon the UCAO Policy; (3) Mr. Buhman continues to defend the Statute's constitutionality; and (4) Mr. Buhman adopted the UCAO Policy as a tactical maneuver to moot this case—are not persuasive.

---

[18] Mr. Buhman did not argue in his opening appeal brief that the Browns lacked standing to bring their claims or that this action became moot before the district court entered its summary judgment order. But "[t]he question of standing is not subject to waiver." *Hays*, 515 U.S. at 742. Mootness is similarly "non-waivable." *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 701 n.20 (10th Cir. 2009). Accordingly, "we are required to address the[se] issue[s] even if . . . the parties fail to raise the issue[s] before us." *Hays*, 515 U.S. at 742; *see also Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) ("[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press."). Our request for supplemental briefing was meant to give the parties an opportunity to argue this important threshold question.

### a. *Only Prospective Relief Is at Issue*

Voluntary cessation cannot moot an action seeking damages because damages compensate a party for past conduct, not ongoing or future conduct. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983); *O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1222 (10th Cir. 2005) ("The complaint, however, also includes a claim for nominal damages. . . . Unlike the claims for injunctive and declaratory relief, this claim is not mooted by [defendant's voluntary cessation]."). But contrary to the district court's understanding, the Browns did not sue for damages and therefore do not seek compensation for any past injuries they may have suffered at the hand of Mr. Buhman. They seek relief only for the future harm of prosecution. If there is no credible threat of such harm, their case is moot. *See Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1176 (10th Cir. 2009) ("As the Supreme Court explained, '[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" (alterations in original) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974))).

In their prayer for relief, the Browns requested only a declaratory judgment and an injunction, plus attorney fees and costs. They did not ask for damages. The complaint's "Nature of the Action" section likewise asked for declaratory and injunctive relief, but not damages. And paragraph 14 of the complaint asserted, without any mention of damages, that jurisdiction exists under 28 U.S.C. § 1343(a)(4) "because this action seeks

- 30 -

equitable relief under 42 U.S.C. § 1983." App., Vol. 1 at 19.[19]  Because the complaint

did not request damages, mootness depends on whether, following Mr. Buhman's

_____

[19] Based on the residual clause in the complaint's prayer for relief—which asks for "such other relief as [the district court] may deem just and proper"—the district court concluded the Browns had requested money damages.  It relied on *Frazier v. Simmons*, 254 F.3d 1247 (10th Cir. 2001), where we held the plaintiff could seek injunctive relief because (1) his complaint requested "such other relief as the Court deems just and *equitable*," and (2) "[i]n the pretrial order, the district court list[ed], as an issue of law, '[t]he nature and extent of any *equitable* relief' to which Mr. Frazier may be entitled." 254 F.3d at 1251, 1255 (emphasis added) (last brackets in original).  Analogizing to *Frazier*, the district court held the "just and proper" language in the Browns' complaint, plus its reference to various past injuries they allegedly suffered as a result of Mr. Buhman's conduct, were sufficient to plead damages.  We think this analogy is too much of a stretch.

      We have been careful to limit *Frazier* to its facts—in particular, the complaint's reference to such other relief as the court deemed "just and *equitable*." *See Guiden v. Morrow*, 92 F. App'x 663, 665-66 (10th Cir. 2004) (unpublished) (distinguishing *Frazier*); *Romero v. City & Cty. of Denver Dep't of Soc. Servs.*, 57 F. App'x 835, 838 (10th Cir. 2003) (unpublished) (same).  Here, nothing in the prayer for relief's residual clause indicated a request for damages.  "Just" and "proper" do not refer to monetary relief in the same way "equitable" can refer to injunctive relief.  In addition, in *Frazier* we were "guide[d]" by an Eighth Circuit case that read similar language broadly because the plaintiff there had sued the defendant in his official capacity and so his "relief need[ed] to be in [injunctive] form to be effective." *See id.* at 1254-55 (quoting *Andrus v. Arkansas*, 197 F.3d 953, 956 (8th Cir. 1999)).  As explained in footnote 10, *supra*, by suing the Defendants only in their official capacities, the Browns may obtain only injunctive relief, not damages, for their § 1983 claims.  The logic of *Andrus* therefore precludes reading the Browns' complaint to include a request for damages, as relief sought against Mr. Buhman in his official capacity would be effective only in injunctive form. *Accord Emory v. United Air Lines, Inc.*, 720 F.3d 915, 921 n.10 (D.C. Cir. 2013) ("While it is true that Fed. R. Civ. P. 54(c) allows a court to grant relief not specifically sought, we cannot save [the plaintiffs'] claim by reading the complaint's boilerplate prayer for 'such other relief as [the Court] may deem just and proper' as a request for monetary damages." (quotation omitted) (first brackets added)).

      In any event, the Browns waived any request for damages before entry of the final judgment from which Mr. Buhman appeals.  App., Vol. 3 at 654, 666-68.  And the Browns have not renewed any request for damages on appeal.  We therefore do not consider retrospective relief when assessing mootness.

announcement of the UCAO Policy, the district court had Article III jurisdiction to award prospective relief to the Browns.  We conclude it did not.

b. *The Browns Do Not Face a Credible Threat of Prosecution*

i. <u>There Is No Reasonable Expectation that Mr. Buhman Will Violate the UCAO Policy</u>

Mr. Buhman's May 2012 declaration unveiled the UCAO Policy, under which the UCAO will prosecute only those who (1) induce a partner to marry through misrepresentation or (2) are suspected of committing a collateral crime such as fraud or abuse.  Nothing in the record suggests the Browns fit, or in the future may fit, into either category.  Indeed, Mr. Buhman affirmed in his declaration that the UCAO had "determined that no other prosecutable crimes related to the bigamy allegation have been or are being committed by the Browns in Utah County as of the date of this declaration." App., Vol. 2 at 329.  The district court found it undisputed that the UCAO "ha[d] found no evidence of any crime by the Browns."  *Brown*, 947 F. Supp. 2d at 1179.  And Mr. Buhman declared that his office had decided not to file charges against the Browns.

Mr. Buhman further declared under penalty of perjury that the Browns will not be prosecuted unless they engage in criminal conduct beyond that proscribed by the Statute. To find this "voluntary cessation is a sham for continuing possibly unlawful conduct," *Rio Grande Silvery Minnow*, 601 F.3d at 1118 (quotation omitted), we would have to conclude the highest-ranking law enforcement official in Utah County had engaged in deliberate misrepresentation to the court.

We see no basis for this conclusion. Close scrutiny of the relevant facts does not suggest Mr. Buhman is attempting to deceive the court. *See Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 56 (1st Cir. 2013) ("We understand [the voluntary cessation] exception to mootness to be highly sensitive to the facts of a given case.").

Mr. Buhman declared that during his tenure as County Attorney, the UCAO had never before received a police report alleging violations of the Statute unconnected to a collateral crime such as fraud or abuse. That suggests why the UCAO in 2010 had no formal policy regarding polygamy prosecutions and why "no one in the office had any recollection of the Utah County Attorney's Office ever prosecuting anyone for the practice of bigamy except, however, for the occasional bigamy case for marriage fraud or for failure to obtain a divorce prior to remarrying." App., Vol. 2 at 328.[20]

Even assuming the UCAO Policy was a reaction to the Browns' suit, that does not necessarily make it suspect. A government official's decision to adopt a policy in the context of litigation may actually make it more likely the policy will be followed, especially with respect to the plaintiffs in that particular case. *See Rosebrock v. Mathis*, 745 F.3d 963, 972 (9th Cir. 2014) ("[W]e have indicated that mootness is more likely if . . . the case in question was the catalyst for the agency's adoption of the new policy

---

[20] According to Ms. Jex, during Mr. Buhman's tenure the UCAO filed a bigamy charge against one defendant for which her Internet search failed to reveal additional charges. This is consistent with Mr. Buhman's statement that the UCAO filed an "occasional" bigamy charge against defendants who had committed marriage fraud or failed to obtain a divorce before remarrying.

. . . ." (quotation and brackets omitted)); *Fed'n of Advert. Indus. Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 931 (7th Cir. 2003) ("[T]he City candidly admits that [a recent court] decision persuaded it to repeal the ordinance because of the risk of losing in the litigation. We find that the City's actions over the course of this litigation do not give rise to an expectation that it will reenact the challenged ordinance.").

We see no basis to question Mr. Buhman's bona fides after he publicly adopted under penalty of perjury and submitted to the federal court the same prosecution policy that the chief law enforcement officer of the state had previously adopted. The risk that Mr. Buhman will revoke or ignore the UCAO Policy under these circumstances is minimal at best, and certainly not enough to sustain a live case or controversy. *See Moore v. Thieret*, 862 F.2d 148, 150 (7th Cir. 1988) ("If the likelihood [of recurrence] is small (it is never zero), the case is moot.").

Nothing in the record suggests Mr. Buhman has attempted "to evade judicial review, or to defeat a judgment, by *temporarily* altering questionable behavior." *City News & Novelty, Inc.*, 531 U.S. at 284 n.1 (emphasis added). Instead, the record shows the UCAO has adopted, and intends to abide by, a policy under which the Browns face no threat of prosecution. Any prospective relief the district court might have awarded in the face of Mr. Buhman's commitment would therefore have virtually no effect "in the real world." *Wyoming*, 414 F.3d at 1212. Mr. Buhman's declaration deprived the parties of a "concrete interest," even a small one, "in the outcome of th[is] litigation." *Chafin*, 133 S. Ct. at 1023.

If Mr. Buhman had announced only that his office had decided not to prosecute the Browns, the question of mootness would be closer. But he did much more than that. First, he announced an office policy that would prevent prosecution of the Browns and others similarly situated in the future. Second, the UCAO Policy is essentially the same as the AG Policy, which the district court considered sufficient to deny the Browns standing to sue the Governor and the Attorney General. Third, the UCAO Policy and the decision not to prosecute the Browns are contained in a declaration that was signed under penalty of perjury and submitted to the federal district court. Fourth, violation of the declaration would expose Mr. Buhman to prosecution for perjury or contempt. *See* 18 U.S.C. § 1621(2) (providing that "[w]hoever . . . in any declaration . . . under penalty of perjury . . . willfully subscribes as true any material matter which he does not believe to be true . . . is guilty of perjury"); 28 U.S.C. § 1746(2) (permitting a declaration made under penalty of perjury to substitute for a sworn declaration, oath, or affidavit); 18 U.S.C. § 401(2) (empowering a federal court to "punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as . . . [m]isbehavior of any of its officers in their official transactions"). Under these circumstances, the Browns face no credible threat of prosecution from the Utah County Attorney.[21]

---

[21] In the absence of a credible threat of prosecution, any allegation of a subjective chilling effect on the exercise of First Amendment rights would not be sufficient to overcome mootness. *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088-89 (10th Cir. 2006) (en banc).

- 35 -

ii. <u>The Browns' Move to Nevada Supports Finding Mootness</u>

Mr. Buhman's May 12, 2012 declaration removed any credible threat of prosecution and mooted this case while it was pending in district court. Our mootness analysis could stop here. But apart from the foregoing, the Browns' case also became moot because their move to Nevada, their successive declarations, and the passage of time eventually eliminated Mr. Buhman's authority under Utah law to prosecute the Browns.

The Browns left Utah for Nevada in January 2011. They alleged in their complaint, filed in July 2011, that they could not "fully perform their religious practices outside of Utah and must return to Utah to engage in certain religious practices." App., Vol. 1 at 22. They "expect[ed] to move back to Utah." *Id.* According to an October 2011 declaration from Kody Brown, the Browns "travel[ed] back and forth to Utah to participate in religious and family activities." *Id.* at 106. In another October 2011 declaration, Janelle Brown said that if the Statute were struck down, the Browns "would feel free to finally return to Utah and would certainly resume [their] open participation in [their] religious community." *Id.* at 114. The district court wrote in its February 3, 2012 order on Defendants' motion to dismiss that "[o]nce the threat of prosecution is lifted, . . . [the Browns] expect to relocate to the State of Utah." App., Vol. 2 at 247.

But circumstances changed. Mr. Brown subsequently told the district court in a July 2012 declaration—submitted two months after Mr. Buhman stated under oath that the UCAO had closed its case against the Browns—that "[w]e have decided to stay in Nevada in the foreseeable future to avoid uprooting our children again and subjecting

- 36 -

them to the continued public recriminations made under the Utah law." *Id.* at 487. The Browns have "continued ties to [Utah], including family and religious connections," Mr. Brown said, but "[we] have settled . . . in Nevada where our children now go to school and where we are in the process of finalizing the purchase of new homes." *Id.* Mr. Brown's declaration said "[t]he decision not to return to Utah was a difficult one for [his] family." *Id.* There is nothing further in the record that suggests the Browns have reversed this decision. As the years have passed, these developments have made it increasingly difficult to conclude the Browns now face a credible threat of prosecution for past or future conduct even if Mr. Buhman had not adopted the UCAO Policy.[22]

First, as to the Browns' past conduct, Utah law provides "a prosecution for . . . a felony . . . shall be commenced within four years after it is committed." Utah Code Ann. § 76-1-302(1)(a); *see also id.* § 76-7-101(2) (defining bigamy as a third-degree felony). The Browns have not lived in Utah for more than five years, and their post-2011 conduct in Nevada cannot subject them to liability in Utah. *See Nevares v. M.L.S.*, 345 P.3d 719, 727 (Utah 2015) ("[U]nless a statute gives a clear indication of an extraterritorial

_____

[22] After oral argument, the Browns submitted a supplemental filing identifying the portions of the record in which they "indicated a desire or intention to return to Utah if the threat of prosecution were negated." Doc. 10337144 at 2. The Browns cite to the complaint, Janelle Brown's and Kody Brown's declarations, and the district court's February 3, 2012 order granting in part Defendants' motion to dismiss for lack of standing. These documents do not suggest the Browns have any current intention to return to Utah. Indeed, we rely on them—in particular the declarations—in concluding the Browns have settled in Nevada for the "foreseeable future." App., Vol. 2 at 487. Moreover, as noted above, whether there is a credible threat to prosecute the Browns under the Statute turns on an objective assessment of the record and not the Browns' subjective perceptions.

application, it has none." (quotation omitted)).  The record does not reveal whether the Browns have traveled to Utah since October 2011, when Kody Brown signed his first declaration, or whether they "purported to marry" or "cohabited" there if they did. Nothing in the record indicates the Browns have violated the Statute in Utah within the four-year limitations period.  It is therefore speculative at best that Mr. Buhman could prosecute the Browns for past conduct.

Second, Mr. Buhman will likely also be unable to prosecute the Browns for future conduct.  In *Dias*, we held the plaintiffs lacked standing to challenge a Denver ordinance banning pit bull ownership because "none of the plaintiffs [then] reside[d] in Denver and none ha[d] alleged an intent to return."  567 F.3d at 1176.  They therefore did not face "a credible threat of future prosecution under the Ordinance."  *Id.*  The Browns appear to be in the same position.  Although the Browns may wish to move back to Utah some day, and although their declarations do not entirely foreclose the possibility that they will do so, they have announced their intention to remain in Nevada for "the foreseeable future."[23]  Unless and until the Browns return to Utah, Mr. Buhman could not, based on

_____

[23] This statement appears in Kody Brown's July 2012 declaration.  Janelle Brown's October 2011 declaration was somewhat equivocal on this point, indicating the Browns would "feel free" to return to Utah if the Statute were invalidated.  But Kody Brown's declaration, submitted nine months later, is more definitive.  *See Lujan*, 504 U.S. at 564 (holding affidavits expressing intent to return to Egypt and Sri Lanka to observe threatened species were "simply not enough" to confer standing—"[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require" (emphasis in original)).

the law and the record, prosecute them even if he wished to do so.  For this independent reason, the Browns face no credible threat of prosecution.

c.  *The Browns' Arguments Against Mootness Are Not Persuasive*

The Browns insist we should discredit Mr. Buhman's announcement of the UCAO Policy.  They deny his "allegedly wrongful behavior could not reasonably be expected to recur."  *Already*, 133 S. Ct. at 727 (quotation omitted).

We have addressed and rejected this argument in the preceding analysis.  We further address the Browns' specific arguments:  that (1) our analysis in *Winsness* governs this appeal, (2) the possibility that Mr. Buhman's successor could ignore the UCAO Policy defeats mootness, (3) Mr. Buhman's failure to renounce the Statute's constitutionality makes prosecution of the Browns more than speculative, and (4) Mr. Buhman's tactical motivation for adopting the UCAO Policy renders his pledge to abide by that policy not credible.  None of these arguments is persuasive.

i.  The So-Called "*Winsness* Factors" Are Not Controlling Doctrine

First, the Browns contend we should evaluate mootness under the three "*Winsness* factors" they say we have employed in similar cases.  Suppl. Aplee. Br. at 17.  The district court "f[ound] these factors helpful and . . . rel[ied] on them" to analyze mootness.  App., Vol. 2 at 491.

In *Winsness*, the police cited Mr. Winsness for burning a symbol onto an American flag and hanging it from his garage.  *Winsness*, 433 F.3d at 729.  An assistant district attorney charged Mr. Winsness with flag abuse but dismissed the charges before trial.  *Id.* at 730.  Mr. Winsness then filed a § 1983 suit in federal court, seeking to enjoin

- 39 -

enforcement of Utah's flag-abuse statute, arguing it violated the First and Fourteenth Amendments. *Id.* In an affidavit attached to his motion to dismiss, the Salt Lake County District Attorney declared that the "'enforceability of the Utah flag abuse statute [wa]s doubtful' in light of *Texas v. Johnson*[, 491 U.S. 397 (1989)]" and that "'[u]nless and until the constitutional doubts about the Utah statute are eliminated through a constitutional amendment or a new decision of the United States Supreme Court, [he had] no intention of prosecuting . . . anyone . . . under the statute.'" *Id.* at 731 (third brackets in original). The assistant district attorney also declared that "'[u]nless the law changes, Mr. Winsness need have no fear of prosecution if he desecrates or alters a flag as a form of political expression.'" *Id.* The district court granted the state's motion to dismiss, concluding the prosecutors' affidavits eliminated any injury in fact. *Id.*

On appeal, we held Mr. Winsness lacked standing when he filed suit. *Id.* at 734. Alternatively, we also said the affidavits mooted the case. *Id.* at 736. "The veracity of the[] affidavits," we said, "is bolstered both by the prosecutors' actions, quickly repudiating the citation against Mr. Winsness, and by *Texas v. Johnson,* which gives the prosecutors good reason to avoid initiating potentially futile prosecutions." *Id.*

One year later, in *Mink*, we considered a pre-enforcement constitutional challenge to Colorado's criminal libel statute. 482 F.3d at 1248-49. Our analysis of whether that challenge was moot included a brief discussion of *Winsness*: "We found [the prosecutors'] assurances established mootness since the government (1) had quickly repudiated the action initially taken against Winsness, (2) its statements were made in sworn affidavits, and (3) it based its decision on controlling Supreme Court precedent,

making future prosecutions unlikely." *Id.* at 1256. We concluded these "*Winsness* factor[s]" also "cut against" finding a live case or controversy in Mr. Mink's case. *Id.* at 1256-57.

The Browns argue we should analyze mootness in pre-enforcement cases by weighing the "*Winsness* factors." As an initial matter, *Winsness* is factually distinguishable. Mr. Winsness, unlike the Browns, was actually charged under the statute he sought to challenge, making his injury substantially more concrete than the Browns'.

Moreover, *Winsness* did not purport to state a definitive test that would govern in every case. Rather, in explaining why "the threat of prosecution ha[d] been eliminated," we pointed to the prosecutors' affidavits and remarked that the veracity of those affidavits was "bolstered" by the three factors we later identified in *Mink*. *Winsness*, 433 F.3d at 736. The "*Winsness* factors" described some evidence supporting the prosecutors' credibility, not a doctrinal test. Although our analysis in *Mink* drew upon these factors, we never held or even suggested they should control in future cases. And neither *Winsness* nor *Mink* foreclosed other factors from "bolstering" the veracity of a policy not to prosecute.

*Winsness* represents a fact-specific application of the general rule that voluntary cessation moots a case when "the allegedly wrongful behavior c[an]not reasonably be expected to recur." *Already*, 133 S. Ct. at 727 (quotation omitted). The district court in this case erred when it limited its analysis to weighing the "*Winsness* factors" and ignored the broader lesson of *Winsness* and *Mink*: that evidence supporting the veracity of the

- 41 -

decision and the policy not to prosecute is important to the mootness analysis. That evidence need not be limited to the "*Winsness* factors."

> ii. The Possibility that a Future County Attorney May Change the UCAO Policy Does Not Defeat Mootness

Second, the Browns argue they are not free from the threat of prosecution because the UCAO Policy "does not and cannot 'bind the future actions or policies of successor Utah County attorneys.'" Suppl. Aplee. Br. at 18 (quotation omitted). The district court accepted this argument, basing its mootness holding in part on its belief that the UCAO Policy was simply "an exercise of prosecutorial discretion that could easily be reversed in the future by a successor Utah County Attorney." App., Vol. 2 at 496.[24]

To argue that a county attorney cannot bind future county attorneys to his non-prosecution policy is unremarkable and unpersuasive. Of course a future county attorney could change the UCAO Policy, but that possibility does not breathe life into an otherwise moot case. If it did, federal courts would be free to exercise judicial review of any rarely used state statute based on the hypothetical that some unknown and yet-to-be-elected local prosecutor someday may flout or change office policy and decide to enforce it. We are not aware of any Article III basis that would permit federal courts to do this.

For voluntary cessation to moot a case, we must be convinced that "the allegedly wrongful behavior could not *reasonably* be expected to recur," *Already*, 133 S. Ct. at 727

---

[24] This concern did not trouble the district court when it dismissed the Governor and the Attorney General from this case based on the AG Policy, which also cannot bind successive attorneys general.

- 42 -

(emphasis added) (quotation omitted), not that there is no possibility of future

enforcement. The latter showing would likely be impossible in most cases. *See Rio

Grande Silvery Minnow*, 601 F.3d at 1117-18 ("We will not require some physical or

logical impossibility that the challenged policy will be reenacted absent evidence that the

voluntary cessation is a sham for continuing possibly unlawful conduct." (quotation

omitted)); *Mink*, 482 F.3d at 1255 ("[W]e have held the possibility of future enforcement

need not be reduced to zero to defeat standing. It is not necessary for defendants to refute

and eliminate all possible risk that the statute might be enforced to demonstrate a lack of

a case or controversy." (quotations and brackets omitted)); *Comm. for First Amendment

v. Campbell*, 962 F.2d 1517, 1525 (10th Cir. 1992) ("Defendants' burden concerning the

unlikelihood of recurrence is a heavy one, but it by no means requires proof approaching

metaphysical certitude."); *see also Clarke v. United States*, 915 F.2d 699, 702 (D.C. Cir.

1990) ("Of course we cannot say that the risk of an attempted prosecution is zero. . . . But

zero risk is not the test."); *Moore*, 862 F.2d at 150 ("If the likelihood [of recurrence] is

small (it is never zero), the case is moot.").

One of the plaintiffs in *Winsness* made a similar argument. He asserted the district

court should retain jurisdiction over his § 1983 suit because "[the district attorney's]

political successors might repudiate [his] policy, or [the plaintiff] might be arrested

elsewhere in the state, or police officers who have not been informed of [the district

attorney's] policy and have not been instructed not to enforce the statute might do so."

433 F.3d at 733. We rejected this contention, explaining that "it is not necessary for

- 43 -

defendants in such cases to refute and eliminate all possible risk that the statute might be enforced." *Id.* The same logic applies in this case.

Although Mr. Buhman cannot control his successors and extend his non-prosecution pledge in perpetuity, there is no reasonable expectation the Browns will face prosecution. The small number of prior UCAO prosecutions—three in a ten-year period, at least two of which also involved charges for collateral crimes—reinforces this conclusion. The UCAO Policy is consistent with, not a departure from, what was apparently a longstanding de facto policy of non-prosecution. And it is consistent with the AG Policy. As a result, the prospect that a future Utah County Attorney will begin prosecuting defendants like the Browns is speculative and remote.

The district court erred by relying on Mr. Buhman's inability to bind future county attorneys.

### iii. Mr. Buhman's Failure to Renounce the Statute's Constitutionality Does Not Defeat Mootness

Third, the Browns insist—and the district court agreed—that we should not take the UCAO Policy at face value because Mr. Buhman "continues to maintain the [Statute's] constitutionality and enforceability." Suppl. Aplee. Br. at 18. This view, which merely repackages part of the Browns' argument in favor of the "*Winsness* factors," holds that a prosecutor's promise not to bring charges is credible only if he believes enforcement would be unconstitutional. We have never adopted this position, and we decline to do so here.

- 44 -

In *Winsness* and *Mink*, we credited the prosecutors' acknowledgement that the charging statutes were unconstitutional as giving them "good reason to avoid initiating potentially futile prosecutions." *Winsness*, 433 F.3d at 736; *Mink*, 482 F.3d at 1257; *see also Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485, 492 (7th Cir. 2004) ("[W]e . . . hold[] that a case is moot when a state agency acknowledges that it will not enforce a statute because it is plainly unconstitutional, in spite of the failure of the legislature to remove the statute from the books."). But contrary to the district court's suggestion, we gave no indication such an acknowledgement is especially probative, much less a significant factor in holding a case moot.

A prosecutor's belief a statute is constitutional does not provide much help in determining the risk of future prosecution. Nor does it render unreliable his or her statements to the court—signed under penalty of perjury—that he will not enforce it. *See Rio Grande Silvery Minnow*, 601 F.3d at 1118 n.17 ("Although the failure of a governmental agency to acknowledge the impropriety of its former, challenged course of conduct certainly is not an irrelevant factor in the voluntary-cessation analysis, it is not dispositive."). Prosecutors can be committed to a non-prosecution policy for reasons unrelated to a statute's constitutionality. *See Am. Civil Liberties Union of Mass.*, 705 F.3d at 55 n.9 ("It is not a purpose of the [voluntary cessation] doctrine to require an admission from the defendant that the now ceased conduct was illegal. Mootness turns on future threats, not upon penance." (quotation omitted)).

- 45 -

Here, Mr. Buhman's continued belief in the Statute's constitutionality does not show he will disregard the statements he made to the district court under penalty of perjury.

#### iv. Mr. Buhman's Motives for Announcing the UCAO Policy Do Not Defeat Mootness

Finally, the Browns argue there remains a live controversy because Mr. Buhman announced the UCAO Policy for tactical reasons to strip the district court of jurisdiction over the Browns' claims. Unlike the district court, we are not persuaded.

Mr. Buhman may have been motivated to institute the UCAO Policy to end the Browns' litigation. Nineteen months had passed between the UCAO's receipt of the Lehi Police Department's report in October 2010 and Mr. Buhman's second declaration in May 2012. He submitted that declaration four months after the district court dismissed Mr. Herbert and Mr. Shurtleff on the ground that the AG Policy—which is materially identical to the UCAO Policy—deprived the Browns of standing to sue those defendants. But even if the UCAO Policy was tactical, this motive alone does not defeat mootness. The ultimate question is whether the UCAO Policy eliminates a credible threat of prosecution.

The Browns point out that we have said "[v]oluntary cessation of offensive conduct will only moot litigation if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction." *Ind*, 801 F.3d at 1214 (brackets in original) (quotation omitted). But this statement must be reconciled with the rule that the existence of a live case or controversy depends on whether "the allegedly wrongful

- 46 -

behavior could . . . reasonably be expected to recur," *Already*, 133 S. Ct. at 727 (quotation omitted)—not on whether a government official has acted out of tactical motives. *See Beta Upsilon Chi Upsilon Chapter at the Univ. of Fla. v. Machen*, 586 F.3d 908, 915 (11th Cir. 2009) ("We are not concerned with [the defendant's] motivation for changing its registration policy, but only with whether a justiciable controversy exists.").

A prosecutor's motives for ceasing allegedly unlawful behavior may be relevant to the credibility of his representation that the plaintiffs will not be prosecuted. When a prosecutor drops charges merely to be rid of a bothersome federal lawsuit, there may be reason to question whether the no-charge commitment is genuine. *See McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015) ("A presumption of good faith . . . cannot overcome a court's wariness of applying mootness under protestations of repentance and reform, *especially when abandonment seems timed to anticipate suit*, and there is probability of resumption." (emphasis added) (quotation omitted)). But if the allegedly unlawful conduct cannot "reasonably be expected to recur," it does not matter that the prosecutor ruled out prosecution because he wished to prevent adjudication of the federal claim on the merits. Either a live controversy exists, or it does not. Federal courts may not exercise jurisdiction over a case simply because the defendant wished the suit to end when ceasing his or her allegedly unlawful conduct.

* * * *

In sum, the Browns' arguments that Buhman's adoption of the UCAO Policy does not moot this case—(1) we must apply the "*Winsness* factors," (2) his successor could change it, (3) he thinks the Statute is constitutional, and (4) he adopted it to end the

lawsuit—do not withstand scrutiny. The first point misreads the case law, the second is speculative, the third is minimally relevant, and the fourth may actually assure compliance with the UCAO Policy because any steps to reconsider would almost certainly provoke a new lawsuit against him. Such steps also would damage Mr. Buhman's credibility as a public official and might even expose him to prosecution for perjury and contempt of federal court for violating his declaration. Assessing the veracity of the UCAO Policy must account for all relevant factors, which together show no credible threat of prosecution of the Browns.

Mr. Buhman's May 2012 declaration is credible. He declared under penalty of perjury that the Browns will not be prosecuted absent evidence of a collateral crime. And the dearth of prior UCAO prosecutions under the Statute—at least for bare violations unconnected to collateral crimes—indicates his position is not mere posturing. *See Susan B. Anthony List*, 134 S. Ct. at 2345 ("We have observed that past enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical." (quotations omitted)); *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004) ("[A] plaintiff cannot show a real threat of prosecution in the face of assurances of non-prosecution from the government merely by pointing to a single past prosecution of a different person for different conduct.").[25]

---

[25] In addition, the district court questioned the sincerity of Mr. Buhman's declaration because "[t]here is no evidence that the notice of the change in policy was given to the public generally or distributed within the county attorney's office." App., Vol. 2 at 492; *see also id.* at 494 ("The failure to give public notice of the change in policy, however, adds to the concern that the action was taken primarily for purposes of
Continued . . .

This case lacks "*clear showings* of reluctant submission [by Mr. Buhman] and a desire to return to the old ways." *Gessler*, 770 F.3d at 908 (emphasis in original) (quotation omitted). On the contrary, the record shows Mr. Buhman intends to follow the terms of the UCAO Policy, including and especially with respect to the Browns. Fear that Mr. Buhman intends to prosecute the Browns in the future would not be "objectively justified." *Winsness*, 433 F.3d at 732. Accordingly, "the issues presented are no longer 'live'" and "the parties lack a legally cognizable interest in the outcome" of this case. *Chafin*, 133 S. Ct. at 1023 (quotation omitted); *see Tandy v. City of Wichita*, 380 F.3d 1277, 1291 (10th Cir. 2004) ("Nothing in the record suggests that Wichita Transit intends to resume its discontinued policies if this case is dismissed as moot. Under such circumstances, it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." (quotation omitted)).

Mr. Buhman's May 2012 declaration rendered the Browns' case constitutionally moot.[26]

---

this litigation."). We fail to see the relevance of this fact. Prosecutors do not generally advertise their enforcement policies to the public, and Mr. Buhman's failure to do so in this case does not throw his credibility into doubt. Moreover, by filing his declaration and the UCAO Policy with the district court, the Policy became a public document.

The district court's concern that Mr. Buhman has "not repudiate[d] [sic] that punishment may be enhanced if a defendant were convicted under the [Statute] and another offense" is similarly misplaced. *Id.* at 494. The record indicates the UCAO has no evidence that the Browns have committed other crimes. Accordingly, the hypothetical possibility that they might one day be prosecuted for a collateral crime does not bear on (1) the credibility of Mr. Buhman's declaration or (2) the existence of a live controversy.

[26] Because the district court lacked Article III jurisdiction to resolve the Browns' claims, we need not decide whether it abused its discretion by finding those claims were

Continued . . .

## 2. **Vacatur**

"If the district court lacked jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit." *Rio Grande Silvery Minnow*, 601 F.3d at 1128 n.19 (quotation omitted). "When a case becomes moot prior to final adjudication, the district court was without jurisdiction to enter the judgment, and vacatur and dismissal of the judgment is automatic." *Id.* (quotation, emphasis, and brackets omitted).

"It is fundamental, of course, that a dismissal for lack of jurisdiction is not an adjudication of the merits and therefore dismissal . . . must be without prejudice." *Abernathy v. Wandes*, 713 F.3d 538, 558 (10th Cir. 2013) (quoting *Martinez v. Richardson*, 472 F.2d 1121, 1126 (10th Cir. 1973)).

The proper disposition of this appeal, therefore, is to remand to the district court with instructions to vacate its judgment in favor of the Browns and dismiss this suit without prejudice.[27]

---

not prudentially moot. *See Jordan*, 654 F.3d at 1023 n.14 ("[W]e ordinarily review a district court's prudential mootness determination for an abuse of discretion." (emphasis omitted)).

[27] As explained above, the Browns' move to Nevada eventually also rendered this case moot. Whether or not this basis for mootness took effect before commencement of this appeal, Mr. Buhman's implementation of the UCAO Policy was independently sufficient to extinguish any live case or controversy as of May 2012, a year and a half before the district court granted summary judgment to the Browns and over two years before entry of final judgment. Because this case became moot "prior to final adjudication," *Rio Grande Silvery Minnow*, 601 F.3d at 1128 n.19, vacatur and dismissal without prejudice are appropriate.

## IV. **CONCLUSION**

Assuming the Browns had standing to file suit in July 2011, this case became moot when Mr. Buhman announced the UCAO Policy in May 2012. That policy eliminated any credible threat that the Browns will be prosecuted. We therefore remand to the district court with instructions to vacate its judgment and dismiss this suit without prejudice.